STATE NATIONAL BANK OF EL PASO, Trustee for Lee Moor Children's Home, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

No. 74-2276.

United States Court of Appeals, Fifth Circuit.

March 13, 1975.

William S. Sessions, U. S. Atty., San Antonio, Tex., Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Chief, Appellate Sec., U. S. Dept. of Justice, Tax Div., Washington, D. C., Eugene G. Sayre, Tax Div., Dept. of Justice, Dallas, Tex., Michael L. Paup, Ernest J. Brown, Acting Chief, Appellate Sec., Tax Div., Dept. of Justice, Washington, D. C., Ronald F. Ederer, El Paso, Tex., for defendant-appellant.

Robert B. Zaboroski, Tad R. Smith, El Paso, Tex., for plaintiff-appellee.

Before THORNBERRY, COLEMAN and ROSENN,* Circuit Judges.

COLEMAN, Circuit Judge.

This is a suit for the refund of $473,641.70 in federal income taxes ($348,050.14 in taxes, plus $125,591.56 interest). The State National Bank of El Paso, the suing taxpayer, is Trustee for the Lee Moor Children's Home. This, undoubtedly, is a charitable trust. The trust owned a 2875 acre irrigated farm in El Paso County, the largest farm in the County. The annual cost of operating the farm was $800,000. The necessary equipment was valued at $350,000.

The question is whether a purported lease agreement with Charles Calhoun was in fact a lease, compensated by rents, exempt from taxation under the pre-1969 I.R.C. § 512(b)(3).[1]

By a directed jury verdict the District Court held, as a matter of law, that there was a valid lease and hence the taxpayer was entitled to the refund. We are of the view that reasonable men might well differ as to the operative inferences to be drawn from the undisputed facts. Consequently, the directed verdict was legally erroneous and we reverse for a new trial.

In 1959 the Bank, as Trustee, became the owner of the 2875 acre farm. It was well aware that if it operated the farm it would be liable for the unrelated business income tax imposed by § 511(a) of the Internal Revenue Code.[2] It began to look for a lessee. The size of the farm and the huge cost of its operation caused great difficulty in finding one. Finally, in late 1959, Charles Calhoun, manager of a neighboring farm, asked the Bank about operating Lee Moor Farm.

Negotiations between the Bank and Calhoun resulted in the execution of a contract for the year 1960. In relevant part it reads:

"That Lessor, for and in consideration of the agreements hereinafter set forth kept, performed and observed by Lessee, has demised and leased to Lessee the real estate in El Paso County, Texas, described on Exhibit A attached hereto and incorporated herein by reference, for the purpose of cultivating and producing thereon and therefrom cotton, feed and other crops and, from time to time, maintaining a cattle operation;

"TO HAVE AND TO HOLD the above described premises with all the privileges and appurtenances belonging to same, unto the Lessee from the

---

* Of the Third Circuit, sitting by designation.

1. "There shall be excluded [from the definition of unrelated business income] all rents from real property (including personal property leased with the real property)", I.R.C., § 512(b)(3).

   For taxable years after 1969 all income received from situations of this type will be taxed:

   [The rent exclusion shall not apply]

   "(ii) if the determination of the amount of such rent depends in whole or in part on the income or profits derived by any person from the property leased (other than an amount based on a fixed percentage or percentages of receipts or sales)." I.R.C., § 512(b)(3)(B)(ii).

2. I.R.C. § 511(a)(1) provides:

   "(a) Charitable, etc., organizations taxable at corporation rates.—

   "(1) IMPOSITION OF TAX.—There is hereby imposed for each taxable year on the unrelated business taxable income (as defined in section 512) of every organization described in paragraph (2) a normal tax and a surtax computed as provided in section 11. In making such computation for purposes of this section, the term 'taxable income' as used in section 11 shall be read as 'unrelated business taxable income'."

   I.R.C., § 513(a) provides:

   "(a) General Rule.—The term 'unrelated trade or business' means, in the case of any organization subject to the tax imposed by section 511, any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501 (or, in the case of an organization described in section 511(a)(2)(B), to the exercise or performance of any purpose or function described in section 501(c)(3) . . . .."

date hereof until December 31, 1960, unless terminated before such time under the provisions of this instrument, on the following terms and conditions:

"1. Lessee shall cultivate and farm said premises in a good and farmerlike manner and deliver to Lessor, as rent for such premises, nine tenths ($\frac{9}{10}$) of all the cotton and cotton seed, feed and other crops raised upon such premises during said year. Lessee shall handle the marketing of all such crops and shall pay nine-tenths ($\frac{9}{10}$) of the value thereof when marketed to the Lessor.

\* \* \* \* \* \*

"4. *At Lessor's expense, Lessee shall maintain and repair all buildings, fences and improvements* upon the premises or which may at any time during such term be erected thereon.

\* \* \* \* \* \*

"7. *Lessor shall furnish* free of charge and expense to Lessee:

(a) *All tools, equipment, machinery, feed and cotton seed, and everything else necessary to the planting and maturing of such crops.*

(b) *All labor, or costs for labor* hired by Lessee, upon such crops and *all expense of hauling* same to the gin and barn.

(c) *All costs for the maintenance and repair of all buildings, fences and improvements*, and for maintaining the premises and every part thereof in good repair and condition. Lessor may pay such costs itself or simply reimburse Lessee for same.

"8. Lessor shall advance to Lessee as a loan the sum of $700.00 per month commencing January 15, 1960 (with the fractional month of January prorated) for his personal and family expenses. Lessee shall repay Lessor therefor without interest at the end of the term of the lease.

\* \* \* \* \* \*

"10. From time to time, *Lessee may buy cattle and conduct a cattle operation on the farm. Lessor will advance all funds required to maintain a normal cattle operation.* In the event that Lessee maintains a cattle operation on the premises, nine-tenths ($\frac{9}{10}$) of the net profits shall be paid to Lessor as rental. 'Net profits' shall mean the gross receipts from the cattle operation less all costs, expenses, damages, claims, liabilities and charges for the year.

"11. If, during such term, Lessee, after 10 days' notice of any breach of any of his obligations under this contract, shall be in breach or default therein, the Lessor may declare the lease at an end, and the same shall thereupon terminate, and Lessor shall have the right to enter, take possession of the premises and farm, harvest and market the crops and conduct the cattle operation, if any, to the exclusion of the Lessee. In such event, Lessor shall render to Lessee (a) the market value when marketed of all the crops so raised, less any damages, costs or expenses incurred in such operation or suffered by reason of Lessee's breach, and less Lessor's nine-tenths ($\frac{9}{10}$) of such value, and (b) one-tenth ($\frac{1}{10}$) of the net profits as of the termination of the lease on the cattle operation.

"12. Lessee shall in no event be construed to be an agent, servant, employee or partner of Lessor, and the relationship between Lessee and Lessor shall be and is that of Tenant and Landlord."

In August, 1960, the lease was amended and extended for another year. The basic effect of the amendment was to change Calhoun's share of the net profits to the greater of 5% or $15,000.

On January 1, 1962, an amended two year lease was executed. The amendment eliminated guaranteed income to Calhoun, provided that Calhoun pay "interest" on the expense money advanced, and decreased taxpayer's share of the profits and expenses to 90%. The precise wording of the amendment was:

"11. Lessee shall pay to Lessor as rental under this lease 90% of the net profits earned on such property through farming and cattle operations

in any one calendar year during the term of such lease. 'Net profits' shall mean the gross receipts from the farming and cattle operation in any one calendar year, less all costs, expenses, damages, claim, liabilities, interest and charges for the year. Depreciation on all depreciable assets supplied by Lessor shall also be deducted in computing 'net profits' for the purposes of this paragraph. Lessor shall be reimbursed out of the gross receipts for all expenses and advances paid by Lessor pursuant to paragraphs 3, 6 and 9 [for farm maintenance and repair and for feed, seed, labor and equipment costs], but *Lessee shall not be obligated to reimburse Lessor except out of such gross receipts* (except for interest thereon as provided in paragraph 12).

"12. Lessee shall pay to Lessor on all sums advanced to Lessee by Lessor for operations under this lease interest at the rate of 6% per annum."

The only issue at trial, which remains the only issue on appeal, is whether the payments made under the contracts were "rents" within the meaning of the pre-1969 I.R.C., § 512(b)(3).

"It appears settled that . . . the expressed intent of the parties [is not] conclusive as to the existence or non-existence of a partnership or joint venture for federal tax purposes . . '[T]he realities of the taxpayer's economic interest rather than the niceties of the conveyancer's art should determine the power to tax.' "

Haley v. Commissioner of Internal Revenue, 5 Cir., 1953, 203 F.2d 815, 818.

In black letter law, a lease is a transfer of an interest in and possession of property for a prescribed period of time in exchange for an agreed consideration, called "rent".

In support of the taxpayer's position it must be recognized that the taxpayer did transfer the property to Calhoun for a prescribed period of time and for a clearly defined consideration.

While not denying that the contract does have some of the characteristics of a lease, the government observes that it also has many of the characteristics of a management contract. Particular attention is called to the facts that:

1. All major expenditures were subject to the approval of taxpayer. In a management contract, the employer has the final word on expenses.

2. The taxpayer advanced (paid) all of the operating expenses and, depending on the year, received 90% to 95% of the profits. In a management contract the expenses are borne by the employer.

3. The amount of taxpayer's rental income depended on the profits of the business. In a management contract the employer's income depends on the profits of the business.

4. All risk of loss was upon taxpayer. In a management contract, risk of loss is upon the employer.

These facts, the government says, show that this was a management contract, *not a lease.* At least, it is argued, the relationship had enough of the characteristics of a management contract to preclude "lease" characterization as a matter of law and we must agree.

In United States v. Myra Foundation, 8 Cir., 1967, 382 F.2d 107, a tax exempt foundation entered into a contract with a farmer described by the trial court as follows:

"That in the year, 1958, farm lands owned by the Myra Foundation were rented by Plaintiff to ten separate tenants pursuant to lease agreements, either written or oral; the Plaintiff as landlord received, as rent for said property for said year, pursuant to the lease, 50 per cent of the crops and produce grown thereon in the case of nine tracts so leased and one-third of the crops and produce grown in the case of one lease; that such leases are in common usage in the area and are commonly entered into by landlord and tenant for the rental of farm lands; that the Myra Foundation did not participate or engage in the farm-

ing business either individually or as a joint operation with others; that the crops or produce received by the Plaintiff in the year, 1958, constituted rents from real property within the meaning of Section 512(b)(3) of the Internal Revenue Code."

The Court of Appeals affirmed the trial court holding that the proceeds of this contract were tax-exempt rents. It specifically rejected the government's contention that "the landlord by furnishing the seed and one-half the cost of fertilizer, weed spray, and combining, has engaged in farming as a partner or joint adventurer". The Court considered such arrangements not inconsistent with "lease" since they are "not unusual", saying:

"The evidence shows that such arrangements are not uncommon in share farm leases. Modern agricultural technology establishes that the use of improved seed, fertilizer and weed spray will under ordinary conditions materially increase the yield and thus increase the net return of both landlord and tenant substantially more than the amount invested by each in such items. There is nothing unusual about providing in leases for the division of the cost of such items which increase the return of both the landlord and the tenant."

The evidence in our case, however, is not so conclusively clear cut.

Cooper Tire & Rubber Company Employees Retirement Fund v. Commissioner of Internal Revenue, 6 Cir., 1962, 306 F.2d 20, is also similar to this case. *Cooper* involved a situation in which the entire financing of a going business was done by a tax-exempt trust which attempted to escape the unrelated business income tax on the ground, among others, that the income it received was rents, or at least, was passive investment income.

The trust bought some twenty tire manufacturing machines on borrowed money. It then "leased" the machines it had purchased to the tire company from which it had bought them. The loan was repaid with the rental income.

The Court rejected taxpayer's argument that its tire manufacturing income was non-taxable, passive investment income. "To us the deal looks more like one to finance the entire purchase price of machinery needed by the tire company rather than a conventional investment", 306 F.2d at 21.

In other words, the Court characterized the transaction not as a lease of real property (including personal property leased with the real property), but as the financing of an entire business operation. Income from such a transaction, it said, is not passive investment income and is taxable.

In Boeing v. Shipman, 5 Cir., 1969, 411 F.2d 365, 374, we said:

"On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury."

█ Applying the *Boeing* standard, the taxpayer-Calhoun relationship presently before us had enough of the indicia of a management contract that reasonable men might conclude that it should be so characterized.

On the other hand, considering prevailing agricultural practices, as they were considered in United States v. Myra Foundation, *supra,* reasonable men might well conclude that having surrendered possession and control of this valuable farm for a fixed period of time the

method used for the computation of the rent supported the transaction as a lease rather than a management contract.

This the jury should have been allowed to decide.

The judgment of the District Court will accordingly be reversed ; and the cause remanded for a new trial.

Reversed and remanded.