**HARLAN E. MOORE CHARITABLE TRUST, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 91–2330.

United States District Court, C.D. Illinois.

Jan. 19, 1993.

Tracy Nugent, Meyer, Capel, Hirschfeld, Muncy, Jahn & Aldeen, Champaign, IL, for plaintiff.

Benjamin R. Norris, U.S. Dept. of Justice, Tax Div., Washington, DC, for defendant.

## ORDER

BAKER, District Judge.

This matter is before the court on cross-motions for summary judgment. The plaintiff, Harlan E. Moore Charitable Trust, is a qualified tax exempt organization and has filed this suit seeking a refund of $19,824.71 ($16,033.66 plus interest) on assessed income tax deficiencies it paid for the years 1986 through 1989.

The tax was assessed on rent from a farm the plaintiff owns in Piatt county as an unrelated business income tax (UBIT) under 26 U.S.C. § 512. The legal issue in this case is narrow: whether the rent, in the form of 50% of the farm's production under a crop-share lease, is non-taxable as a fixed percentage of receipts or sales, or is taxable as an amount dependent on the income or profits of the lessee.

The plaintiff argues the income falls within the parenthetical exclusion of § 512(b)(3)(B)(ii) [1] as a rent based on a fixed percentage of receipts, that is 50% of the crop production. Alternatively, the plaintiff claims the crops are excludable rent from real property under § 512(b)(3)(A)(i).

The government contends that the relationship between the Trust and the farmer is not landlord-tenant but a partnership or joint venture and the crops are not true rents. The government asserts that, under 26 C.F.R. 1.512(b)–1, the farm operation generates income, not true rents, that is not within the modifications for rents. Alternatively, the government maintains that the rent from the crop-share agreement is dependent on the income or profits of the lessee, not on a percentage of receipts or sales, and therefore the exception in § 512(b)(3)(B)(ii) governs.

## BACKGROUND

The Harlan E. Moore Charitable Trust was founded in 1976 and has tax-exempt status under § 501(c)(3). The Trust owns a 400–acre farm in Piatt County, Illinois that is managed by Daryl Mealiff of the farm management department at the Bank of Illinois. Steven Dodge farms the land. Dodge and his father-in-law entered into a crop share agreement with the Trust in 1979.

---

1. Subsection § 512(b) provides, in pertinent part,

MODIFICATIONS
(3) In the case of rents—
  (A) Except as provided in subparagraph (B), there shall be excluded—
  (i) all rents from real property ...

  (B) Subparagraph (A) shall not apply—
  (ii) if the determination of the amount of such rent depends in whole or in part on the income or profits derived by any person from the property leased (other than an amount based on a fixed percentage or percentages of receipts or sales).

According to the terms of the agreement, Dodge lives in the farm house and works the land but does not pay any cash rent to the Trust; instead, Dodge's rent is 50% of farm production after the crop is divided at the grain elevator. The Trust and Dodge have signed two leases, with essentially similar terms, the first in 1979 and the second in 1989.[2]

The lease refers to the plaintiff as "Owner" and Steven Dodge as "Tenant." Dodge has possession and control of the farmhouse and farm. The lease specifies the division of responsibilities: the Trust pays the property taxes and building maintenance expense and the tenant supplies all of the labor, machinery, fuel and hauling expenses. The cost of seed, fertilizer, limestone, herbicides, insecticides, soil tests and grain drying are split equally between the Trust and Dodge.

Dodge decides what seed to plant, when to apply fertilizer, herbicides and insecticides, when to harvest the crop and when to sell his half of the production. Deposition of Mealiff at 22–27; Deposition of Dodge at 12–17. Dodge and the Trust each carry hail insurance for their half of the crop. Mealiff at 30–31; Dodge at 32. The Trust and Dodge are billed separately for their portion of the shared costs. Dodge at 18. Mealiff and Dodge intend the lease to create a landlord-tenant relationship. Mealiff at 12; Dodge at 37. Neither party holds itself out as the other's partner, nor has one paid the other's expenses or undertaken the other's responsibilities. Mealiff at 64.

## ANALYSIS

A. Relationship between the Trust and Dodge

■ The government contends that the parties are not actually landlord and tenant but in fact are partners or joint venturers. The government points to the shared cost of seed, fertilizer, herbicides and drying as evidence of the joint venture. The most important element in determining whether a landlord-tenant relationship or joint venture exists is the intention of the parties. *Petry v. Chicago Title & Trust Co.*, 51 Ill.App.3d 1053, 1057, 9 Ill.Dec. 951, 367 N.E.2d 385 (2d Dist.1977). The burden of proving the existence of a joint venture is on the party who claims the relationship exists. *Id.*

■ Landowners and farmers have undertaken crop-share arrangements in Illinois for well over a hundred years. *Alwood v. Ruckman*, 21 Ill. 200 (1859). Illinois courts find it obvious that farming on shares creates a landlord-tenant relationship. *Baker Farmers Co. v. ASF Corp.*, 28 Ill.App.3d 393, 395, 328 N.E.2d 369 (3d Dist.1975). However, an agreement to carry on farming operations can become a joint venture. *Id.; Petry*, 51 Ill.App.3d at 1057, 9 Ill.Dec. 951, 367 N.E.2d 385.

> [A] joint venture contemplates an enterprise jointly undertaken; that it is an association of such joint undertakers to carry out a single project for profit; that there must be a community of interest in the performance of a common purpose, a proprietary interest in the subject matter, a right to direct and govern the policy in connection therewith, a duty, which may be altered by agreement, to share both in profit and losses.

*Petry*, 51 Ill.App.3d at 1056–57, 9 Ill.Dec. 951, 367 N.E.2d 385 (citing *Carroll v. Caldwell*, 12 Ill.2d 487, 496–497, 147 N.E.2d 69 (1957)). One member of the joint venture is liable to third parties for acts of the other venturer, especially payment of debts. *Baker*, 28 Ill.App.3d at 396, 328 N.E.2d 369. In a joint venture as in a partnership, where one person holds him or herself out as a partner, others who permit such holding out are liable for the actions or debts incurred in the course of the partnership. *Id.*

■ There is no evidence that the relationship between the Trust and Dodge is a partnership or joint venture. The deposition testimony establishes that both parties to the lease intend a landlord-tenant relationship. Dodge makes the farming decisions. Dodge and Mealiff are billed sepa-

---

**2.** Dodge's father-in-law is not a party to the 1989 agreement.

rately for the shared expenses and never have assumed one another's debts. The government has adduced no evidence that Dodge and the Trust have held themselves out as partners or have assumed the debts of each other. Although the government contends that decisions made by mutual agreement between Dodge and the farm manager evidence a partnership or joint venture instead of a landlord-tenant relationship, there is nothing unusual about an owner employing farm managers to supervise and protect the owners interest. *See* Affidavit of C. Allen Bock.

The parties to the lease do not share in each other's profits or losses and consider their relationship to be landlord/tenant. There are no indications to the contrary. The crop-share agreement generates true rents that qualify as an exclusion under § 512(b)(3)(A)(i).

B. Crop share rents: receipts or profits?

█ In the alternative, the government claims that rent from the crop-share agreement is based on a percentage of income or profits and therefore not exempt from the UBIT under § 512(b)(3)(B)(ii). The Trust asserts that rent in the form of crops is more analogous to receipts or sales within the parenthetical exclusion of that same Code section. The court agrees with the plaintiff. Although neither categorization is perfect in this situation, the language of 512(b)(3)(B)(ii), its legislative history and the few cases that have addressed this issue indicate that rent under a crop-share agreement should fall within the purview of the parenthetical exclusion of § 512(b)(3)(B)(ii).[3]

Before 1950, tax-exempt organizations were not subject to unrelated business income taxes. In 1950, Congress imposed the UBIT on certain exempt organizations but excluded "all rents from real property (including personal property leased with the real property), and all deductions directly connected with such rents." 26 U.S.C. § 512(b)(3) (1954).

This broad exclusion lead to abuses. In 1969, Congress responded to the inequity of taxing some exempt organizations and not others and to cases such as *University Hill*,[4] by extending the UBIT in 1969 to all exempt organizations and through enactment of the current modifications in § 512(b)(3). H.R.Rep. No. 91–413, 91st Cong., 1st Sess. (1969) U.S. Code Cong. & Admin. News pp. 1645, 1692. The House Report intended investment income such as "dividends, interest, annuities, royalties, and most passive rental income [to be] free of the unrelated business income tax." *Id.* The House Report on the 1969 amendment emphasized the damaging consequences "feeder organizations" had on tax revenue and sought to eliminate the unfair business competitive advantage some businesses enjoyed by paying "rent" to a tax-exempt organization which in reality funnelled money from the taxable entity to the exempt one. *Id.* at 1691.

The Senate report incorporated the concept of "passive" rentals but differentiated taxable rent that is measured by the property's net income from excludable rent based on a percentage of gross receipts. S.Rep. No. 91–552, 91st Cong., 1st Sess. (1969) U.S. Code Cong. & Admin. News p. 2067. Congress wanted to tax property rentals that are "measured by reference to the net income from the property." *Id.*

█ Whether a particular item of income falls within any of the modifications provided in § 512(b) is determined by all the facts and circumstances of each case. 26 C.F.R. 1.512(b)–1. Nowhere in the Code or Regulations is "rent" defined. *United States v. Myra Foundation,* 382 F.2d 107, 109 (8th Cir.1967). Illinois, however, recognizes that rent may be paid as a portion of the crops. *Alwood,* 21 Ill. at 201 (1859).

---

3. The government has submitted two IRS private letter rulings. While the court has read those decisions, it is neither bound nor persuaded by these private letter rulings and does not include them in its analysis.

4. In *University Hill Foundation v. Commissioner of internal Revenue,* 51 T.C. 548 (1969), *rev'd,* 446 F.2d 701 (9th Cir.1971), the Tax Court found $10 million excess profits from a feeder organization were "rentals" of the tax-exempt Foundation's real property and therefore free from tax liability.

While the Code generally excludes "all rents from real property" from the UBIT, it does not distinguish between commercial and agricultural rental property.

The government contends that because *net* income for the Trust and farmer may vary depending on crop yield, a rent based on 50% of production is income or profits. Yet, it is entirely conceivable that the Trust may have a net loss from the farm one year and Dodge will have net income for the same year, or vice versa. Although the regulations do not contain an illustration of unrelated business taxable income on point, the regulations that correlate to § 512(b)(3)(B)(ii) are entitled "Net profits," an indication that the Code is concerned with rents calculated as a percentage of income after expenses are deducted. See 26 C.F.R. 1.512(b)–1(c)(2)(iii)(b).

Under the lease, the Trust and Dodge each receive 50% of the crop production as it is weighed and divided at the grain elevator scales. While the yield may vary from year to year, the amount each takes (50%) does not. The grain is apportioned 50–50 without regard to the Trust's or farmer's expenses. Each entity sells its half of the grain independently and one does not know what price the other receives for the grain. The Trust and farmer have independent expenses and overhead that determine whether each will make a profit or suffer a loss. The crop-share agreement provides for pre-expense division of crops and is akin to rent based on a percentage of *gross* income, and more analogous to sales or receipts than to net income or profits.

Only three cases have been cited related to the issue of whether rent from a crop-share agreement constitutes unrelated business taxable income for a tax-exempt organization. *State Nat'l Bank of El Paso v. United States*, 509 F.2d 832 (5th Cir. 1975); *United States v. Myra Foundation*, 382 F.2d 107 (8th Cir.1967); *Independent Order of Odd Fellows Grand Lodge of Iowa v. United States*, No. 90–552–A, 1991 WL 487240, 1991 U.S. Dist. LEXIS 14958 (S.D. Iowa Sept. 27, 1991).

The government contends the 50–50 split of the cost of seed, fertilizer, herbicides and drying is evidence that the Trust is involved in the "risks" of the farming business. The court in *Myra* was presented with and decided that issue.[5] It addressed whether splitting costs negated the taxpayer's assertion of a landlord-tenant relationship and found

> [Cost sharing] arrangements are not uncommon in share farm leases. Modern agricultural technology establishes that the use of improved seed, fertilizer and weed spray will under ordinary conditions materially increase the yield and thus increase the net return of both landlord and tenant substantially more than the amount invested by each in such items. There is nothing unusual about providing in leases for the division of the cost of such items which increase the return of both the landlord and the tenant.

*Myra*, 382 F.2d at 111.

The plaintiff has submitted affidavits from C. Allen Bock, professor of Agricultural Law at the University of Illinois, that state that the terms and conditions of the lease are standard for crop-share leases in central Illinois and that 95% of the crop-share leases provide for 50–50 split of the seed, fertilizer, herbicides and drying ex-

---

**5.** *Myra* analyzed § 512(b)(3)(1954) which read, "There shall be excluded all rents from real property (including personal property leased with the real property), and all deductions directly connected with such rents." This predecessor to the current § 512(b)(3) did not differentiate between rents based on income or receipts.

The other reported cases do not provide better guidance on the issue. In *State Nat'l Bank of El Paso*, the Fifth Circuit examined whether rent from a crop-share lease is an excludable UBIT under the current version of § 512(b)(3). The District Court directed a verdict in favor of the taxpayer and the Court of Appeals reversed and remanded for a new trial, stating that reasonable people could differ on the interpretation of the lease agreement. *El Paso*, 509 F.2d at 833. The court did not reach the issue whether rent from a crop-share agreement is excludable income.

Similarly, in *Odd Fellows*, the District Court did not decide whether crops fall within or outside the parenthetical exclusion of § 512(b)(3)(B)(ii) because there were remaining issues of fact which precluded summary judgment. *Odd Fellows*, 1991 WL 487240, 1991 U.S. Dist. Lexis 14958.

penses. The government has not supplied any counter-affidavits or evidence and, as the court in *Myra* noted, it would be against public policy to require a landlord to withhold application of technological advances and watch the fertility and value of the land diminish.

Undoubtedly, if the farm were leased to Dodge on a cash-rent basis, the rent would be excludable under § 512(b)(3)(A). It seems anomalous that identical activities undertaken on a crop-share lease should be taxable. Given the long history of crop-share leases in Illinois and without a clear directive from Congress to the contrary, the court rules that division of the crops under the crop-share lease is a receipt and not a profit.

To prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Herman v. National Broadcasting Co., Inc.*, 744 F.2d 604, 607 (7th Cir.1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1393, 84 L.Ed.2d 782 (1985). In reviewing the motion, the court must view all evidence in the light most favorable to the non-moving party. *Black v. Henry Pratt Co.*, 778 F.2d 1278, 1281 (7th Cir.1985). However, the court will enter summary judgment if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. There is no genuine issue for trial when the record taken as a whole could not lead a rational jury to find for the non-moving party. *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359 (7th Cir.1988).

The dichotomy of "receipts or sales" or "income or profits" in § 512(b)(3) is imperfect in this situation; however, the court is convinced that the parties intended to and did create a landlord-tenant relationship under the lease. The rent paid in the form of 50% of the crop yield is true rent and excludable under § 512(b)(3)(A)(i). Additionally, it is rent based on a fixed percent-age that is established before either party considers its independent operating expenses. Under all the circumstances of this case, the court finds that the rent paid in the form of crops are more analogous to receipts than income or profits and are within the parenthetical exclusion of § 512(b)(3)(B)(ii).

### CONCLUSION

Based on the language in § 512(b)(3), treasury regulations, case law, the nature of the crop-share arrangements and the relationship between the Trust and the farmer, the court concludes the rents from the farm operation are true rents that are based on a fixed percentage of receipts from the farm production. The rental income from the farm operation falls within the modifications of § 512(b)(3)(A)(i) and § 512(b)(3)(B)(ii) and is exempt under § 511(a)(1). Summary judgment is granted in favor of the plaintiff and against the defendant.

IT IS THEREFORE ORDERED that plaintiff's motion for summary judgment (docket # 6) is allowed and defendant's motion for summary judgment (docket # 10) is denied. The clerk is directed to enter judgment in favor of the plaintiff and against the defendant. Each party shall bear its own costs.