TRUST U/W EMILY OBLINGER, STEPHEN DEXTER AND EMILY JANE TIPTON DOLE A.K.A. THE STEPHEN DEXTER DOLE AND EMILY JANE TIPTON DOLE TRUST FUND, BANCENTRAL TRUST, TRUSTEE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 29163–90.     Filed February 23, 1993.

*R. Nicholas Burton,* for petitioner.
*John W. Duncan,* for respondent.

PARR, *Judge:* Respondent determined deficiencies in petitioner's Federal tax as follows:

| Year | Excise tax sec. 4940(b) | First tier tax sec. 4942(a) | Second tier tax sec. 4942(b) |
|------|------|------|------|
| 1985 | $8,836 | - - - | - - - |
| 1986 | 17,273 | $972 | $6,483 |

The issue for decision is whether rents received under sharecrop leases are excluded from unrelated business taxable income pursuant to section 512(b)(3)(B)(ii).[1]

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits are incorporated herein by this reference.

Petitioner is a charitable trust created pursuant to the terms of the last will and testament of Emily D. Oblinger (herein will), who died on September 15, 1958. Petitioner

---

[1] All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

filed private foundation tax returns, Form 990-PF, for the tax years in issue indicating its status as a nonexempt charitable trust under section 4947(a)(1). Petitioner has not applied for exempt status under section 501(c).

The trust estate consists of farmland formerly owned by Emily Oblinger and is located in Illinois. Under the terms of the will, petitioner is authorized to operate the farmland, pay necessary expenses, make necessary improvements, and rent the farmland. The net funds derived from the farmland are distributed to scholastically qualified and financially needy students attending the University of Illinois, with a preference given to agricultural students. On the 25th anniversary of Emily Oblinger's death, petitioner is given the authority and discretion to sell the farmland.

During the years in issue, the trust leased farmland to Edwin Wetzel and Leroy Wetzel (hereinafter the tenant) by means of three sharecrop leases.[2] Under the terms of the leases, the tenant was responsible for all machinery, equipment, power, and labor necessary to farm the land. The tenant was also responsible for all labor, except skilled labor, required for repairs and improvements to the farm.

Petitioner supplied the farm and buildings thereon, materials necessary for repairs and improvements on the farm, and skilled labor for making permanent improvements. Petitioner was also responsible for 50 percent of the cost of seed, fertilizer, limestone, herbicides, and insecticides.

Additionally, petitioner and the tenant agreed:

4. Landowner shall in no way be liable in damages for failure of water supply or for any damage by the elements or otherwise, to any of the improvements, nor for any loss or damage while improvements are under construction repair nor for any failure to repair or alter or replace any buildings or improvement.

5. Tenant takes possession of the leased premises subject to the hazards of operating a farm, and assumes all risk of accidents to himself, his family, his employees, or agents in pursuance of his farming operations, or in performing repairs to the buildings, fences and other improvements.

\*   \*   \*   \*   \*   \*   \*

7. Landowner and Tenant agree to confer \* \* \* for the purpose of planning land use and estimating cash costs which the landowner is to share or pay during the lease year.

---

[2] The terms "tenant", "rent", and "lease" are used for convenience and are not meant to be determinative of the legal issues herein.

The amount of rent payable to petitioner under the leases is fixed at 50 percent of the harvested corn, oat, soybean, and wheat crops. Petitioner received proceeds from the sale of its share of harvested crops of $34,331 and $55,105 in 1985 and 1986, respectively.

OPINION

## I. *Was Petitioner a Tax-Exempt Private Foundation?*

Respondent contends that petitioner is not exempt under section 501(c), since it failed to apply for such exemption and indicated on its Form 990-PF for 1985 and 1986 that it was a "4947(a)(1) trust"—a charitable trust not exempt from taxation under section 501(c).

Petitioner argues that it is a tax-exempt private foundation qualifying under section 501(c)(3), and its failure to apply for exempt status is irrelevant since it is a pre-October 1969 foundation.

Section 4940(a) provides for an excise tax on the net investment income of exempt private foundations. These exempt organizations are likewise subject to the unrelated business income tax imposed under section 511. Nonexempt foundations, including section 4947(a)(1) trusts, are taxed on their net investment income under section 4940(b). Section 4940(b) also includes in its calculation the tax imposed under section 511. Hence, whether petitioner is a section 501(c) foundation and taxed under sections 4940(a) and 511, or a section 4947 foundation and taxed under section 4940(b), petitioner is subject to the tax on unrelated business income and the excise tax on its net investment income.

Consequently, since this issue is not dispositive of the outcome of this case, we decline to address it.

## II. *Section 512(b)(3) Rent Modification to UBIT*

Section 511 imposes a tax on the unrelated business taxable income (herein UBIT) of most exempt organizations, including charitable organizations. UBIT is defined in section 512(a)(1) as the gross income derived by an exempt organization from any unrelated "trade or business" (as defined in section 513) regularly carried on by it, less deductions directly connected with the trade or business, subject to modifications provided in section 512(b). The term "trade or

business" is defined as "any trade or business the conduct of which is not substantially related * * * to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501." Sec. 513(a).

In order for a tax to be imposed upon an activity of a tax-exempt organization, three general requirements must be met: (1) The activity must constitute a trade or business; (2) the activity must not be substantially related to the organization's exempt purposes; and (3) the activity must be regularly carried on. Sec. 1.513-1(a), Income Tax Regs.; see also *Suffolk County Patrolmen's Association v. Commissioner,* 77 T.C. 1314, 1319 (1981). The parties agree that petitioner's leasing activities fulfill the requirements of an unrelated trade or business as set forth above.

Thus, the question that remains for our determination is whether the income generated from petitioner's sharecrop leases is subject to the tax on UBIT or is excluded under section 512(b)(3).

Section 512(b)(3) excludes from the taxable base of sections 511 and 512(a) rents from real property and rents from personal property leased with real property. Prior to the Tax Reform Act of 1969 (TRA 1969), Pub. L. 91-172, 83 Stat. 487, section 512(b)(3) excluded all real property rents from UBIT. See *United States v. Myra Foundation,* 382 F.2d 107 (8th Cir. 1967). TRA 1969 section 121, 83 Stat. 538, amended section 512(b)(3) by adding a passive rent test. The passive rent test includes rent in UBIT if "the determination of the amount of *such rent depends in whole or in part on the income or profits* derived by any person from the property leased". Sec. 512(b)(3)(B)(ii); secs. 1.512(b)-1(c)(2)(iii)(*b*), 1.856-4(b)(3), (6) (other than subdivision (b)(6)(ii)), Income Tax Regs.

Notwithstanding, rent may still be excluded from UBIT when the amount of rent is based on a "fixed percentage or percentages of receipts or sales". Sec. 512(b)(3)(B)(ii); sec. 1.856-4(b)(3), Income Tax Regs. In order to exclude rents from UBIT under these regulations, rents must in substance qualify as rent, as opposed to actually representing a return of profits by the tenant or a share of profits retained by the landlord as either a partner or joint venturer, see sec. 1.512(b)-1, Income Tax Regs., and not violate the section 512(b)(3)(B)(ii) passive rent test.

Section 1.512(b)-1, Income Tax Regs., provides that whether a particular item of income falls within the purview of a section 512(b) modification is to be determined by all the facts and circumstances of each case. That is, regardless of the parties' characterization of income as "rent", the substance of the arrangement governs.

A. *Lease v. Joint Venture or Partnership*

Respondent argues that petitioner and the sharecroppers engaged in either partnerships or joint ventures and that the payments under the sharecrop leases represent a return of profits. Such a return of profits would be included in UBIT. Respondent bases her argument on the degree of petitioner's involvement with the sharecroppers. Specifically, respondent points to petitioner's agreements with the sharecroppers to confer for the purpose of planning land use and sharing certain costs. Respondent asserts the sharecrop leases represent in reality partnership or joint venture agreements.

When determining whether a partnership or a joint venture exists for Federal tax purposes, we consider—

whether, considering all the facts—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent—the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. [*Commissioner v. Culbertson,* 337 U.S. 733, 742 (1949); fn. ref. omitted.]

Yet it is well settled that neither local law nor the expressed intent of the parties is conclusive as to the existence or nonexistence of a partnership or joint venture for Federal tax purposes. *Haley v. Commissioner,* 203 F.2d 815, 818 (5th Cir. 1953), revg. and remanding 16 T.C. 1509 (1951); see also *Commissioner v. Culbertson, supra* at 736, 742; *Heiner v. Mellon,* 304 U.S. 271, 279 (1938); *Poplar Bluff Printing Co. v. Commissioner,* 149 F.2d 1016 (8th Cir. 1945); *Second Carey Trust v. Helvering,* 126 F.2d 526, 528 (D.C. Cir. 1942), affg. 41 B.T.A. 800 (1940). The realities of the taxpayer's economic interest rather than the niceties of the conveyancer's art should determine the power to tax. *Haley v. Commissioner, supra* at 818. Among the critical elements

involved in this determination are the existence of controls over the venture and a risk of loss in the taxpayer. *Bauschard v. Commissioner,* 279 F.2d 115 (6th Cir. 1960), affg. 31 T.C. 910 (1959); *Haley v. Commissioner, supra.* Inasmuch as we are not bound by the nomenclature used by the parties, the mere fact that petitioner's contract states that it is a "crop share lease" and that the relationship between the parties is "landlord" and "tenant" is not, in itself, decisive.

In *United States v. Myra Foundation, supra,* the Court of Appeals for the Eighth Circuit held that the relationship between Myra Foundation, a charitable organization, and its tenant farmer was landlord-tenant, not joint venture or partnership.

The primary issue for decision at the appellate level was whether the rent, equaling 50 percent of the crops and produce grown on the farm, constituted rent excludable from UBIT. Since the court found nothing in section 512(b)(3) or its legislative history indicating whether the word "rent" was to be given an unusual or restricted meaning, the court examined State court decisions to ascertain the ordinary meaning to be given to the word "rent". The court noted that the written contracts at issue frequently used the words "lease" and "rent", and contained provisions usually found in leases. *United States v. Myra Foundation, supra* at 110. The court also noted that the tenants furnished all the machinery and the labor in the production of crops and generally made decisions with a farm manager as to the day-to-day operation of the farm. *Id.* at 111. The court concluded that the contract as a whole clearly reflected the intention of the parties to create a landlord-tenant relationship. *Id.*

The Government argued that Myra Foundation, by furnishing the seed and one-half of the cost of fertilizer, weed spray, and combining, had engaged in farming as a partner or joint venturer. The Government's argument was unsuccessful. The court noted that such arrangements were not uncommon in sharecrop leases, and further noted that the furnishing of such items ordinarily increased the crop yield and the net return of both the landlord and the tenant substantially more than the amount invested by each for such items. Accordingly, the court concluded that a lease provision dividing the cost of such items was not unusual. *Id.*

Finally, the court analyzed the effect on the landlord-tenant relationship of Myra Foundation's hiring a farm manager for the supervision of the tenant farmers. The farm manager advised the tenant farmers on such topics as crops, seed, weed spray, and fertilizer. Decisions were made by the mutual agreement of the tenant farmer and the farm manager. The Eighth Circuit concluded that the provision regarding the farm manager did not affect the landlord-tenant relationship, and affirmed the District Court's holding that the rent was excluded from UBIT pursuant to section 512(b)(3). *United States v. Myra Foundation, supra; Moore Charitable Trust v. United States,* 812 F. Supp. 130 (C.D. Ill. 1993).

*Myra Foundation* was decided prior to TRA 1969, which added to section 512(b)(3) the passive rent test under section 512(b)(3)(B)(ii). Notwithstanding TRA 1969, *Myra Foundation* is germane to the preliminary issue of whether rent is in substance rent.

Like the taxpayers in *Myra Foundation,* petitioner and the tenant entered into standardized agreements entitled "Crop Share Lease". The terms "landowner", "tenant", "lease", "crop share lease", and "rent" appear throughout the sharecrop leases. The lease was renewable annually following review of the lease and farm plan by the tenant and farm manager before fall plowing, chiseling, or seeding.

Under the terms of the lease, petitioner was obligated to furnish half of the seed, limestone, fertilizer, herbicides, and insecticides. As in *Myra Foundation,* the tenant alone was responsible for furnishing all machinery and equipment. The tenant took possession of the premises subject to the "hazards of operating a farm"; the lease specifically limited petitioner's exposure to potential liability from the operation of the farm.

Petitioner appointed Central National Bank as its agent. As agent, the bank was charged with the responsibility of managing the property. Petitioner agreed to confer with the tenant and the farm manager for the purpose of planning land use and estimating cash costs which petitioner was obligated to share. The evidence is clear, and we so find, that petitioner did not itself or through its managing agent participate in the day-to-day operations of the farm to a degree which would support the existence of a joint venture or partnership with the tenant.

Moreover, the provision conferring liability for all accidents relative to farming upon the tenant undermines respondent's theory that petitioner and the tenant operated the farm as partners or joint venturers.

Finally, petitioner was not required to contribute to losses, which is standard in most partnerships and joint ventures. Nor were there any provisions to carry over losses from one year to reduce payments to petitioner in later years. Such a carryover would be indicative of partnerships and joint ventures.

The evidence shows that sharecrop leases with terms similar to the ones in issue are typically used in central Illinois and such leases are commonly understood to create landlord-tenant relationships.

For all of the above reasons, we find that petitioner and the sharecroppers did not intend to, and in fact did not, enter into joint ventures or partnerships to operate the farm. Moreover, we find the agreements petitioner and the share-croppers entered into are sharecrop leases creating landlord-tenant relationships with the payments thereunder representing rent.

Still, the question remains whether the rent under the sharecrop leases violates the section 512(b)(3)(B)(ii) passive rent test and thus is taxable under UBIT.

### B. *Section 512(b)(3)(B)(ii) Passive Rent Test*

Section 512(b)(3)(B)(ii) contains the passive rent test. The *regulation addressing the passive rent test provides that an* amount is excluded from "rents from real property" if, considering the lease and all the surrounding circumstances, the arrangement does not conform with normal business practice and is in reality used as a means of basing the rent on income or profits. Secs. 1.512(b)-1(c)(2)(iii)(*b*), 1.856-4(b)(3), (6) (but not par. (b)(6)(ii)), Income Tax Regs.

The legislative history of section 512(b)(3) refers to the test used to determine passive rentals under section 856 and the regulations thereunder, involving real estate investment trusts (REIT's). S. Rept. 91-552, at 68-69 (1969), 1969-3 C.B. 423, 468. The legislative history of section 856 states "rents from real property" is defined to prevent income from active business operations from being included as qualified income

of an REIT and to insure that active business income is not given "conduit" tax treatment. Act of Sept. 14, 1960, Pub. L. 86-779, sec. 10, 74 Stat. 1003.

Under section 512(b)(3)(B)(ii), rental income from real property does not include amounts received from such property where the determination of this amount depends in whole or in part on the income or profits derived from the property. This provision is intended to prevent avoidance of unrelated business income tax where a profit-sharing arrangement will, in effect, make the lessor an active participant in the operation of the property.

An exception is provided for amounts based on a fixed percentage or percentages of receipts or sales. These amounts are customary in rental contracts and are generally considered to be different from the profit or loss of the lessee. Generally, rents received from real property would not be disqualified solely by reason of the fact that the rent is based on a fixed percentage of total receipts or sales of the lessee. However, the fact that a lease is based upon a percentage of total receipts would not necessarily qualify the amount received or accrued as rent from real property.

For example, an amount would not qualify as rent from real property if the lease provides for an amount measured by varying percentages of receipts and the arrangement does not conform with normal business practices but is in reality used as a means of basing the rent on income or profits. Act of Sept. 14, 1960, Pub. L. 86-779, sec. 10, 74 Stat. 1003; sec. 1.856-4(b)(3), Income Tax Regs.

Respondent argues that even if the sharecrop leases create a landlord-tenant relationship, as we have already determined, the rents thereunder are still included in UBIT since the rents violate the passive rent test in section 512(b)(3)(B)(ii). Respondent contends that, due to petitioner's splitting of the expenses, its involvement in the farming operations, and its receipt of a percentage of production as rents, rather than a percentage of receipts, petitioner violates the passive rent test. We disagree.

Net profits from farming have been defined as the gross receipts from farming in any one calendar year, less all costs, expenses, damages, claims, liabilities, interest, and charges for that year. See, e.g., *State National Bank of El Paso v. United States,* 509 F.2d. 832 (5th Cir. 1975). By contrast,

petitioner's rental fee was based solely upon a fixed percentage of the crops; i.e., one-half of the corn, oats, soy beans, and wheat. Petitioner shared the costs of some of the expenses relative to farming, such as fertilizer, herbicides, limestone, and insecticides. The tenant, however, bore the entire cost of damages, claims, interest, and other liabilities. As stated above, sharing expenses is customary in sharecrop leases in central Illinois. Also, as stated, the sharecrop lease explicitly exonerates petitioner from any liability, claim, and/or damages. Thus, we hold that the crop shares to petitioner are rental income based upon a percentage of the receipts of the harvest. It is the equivalent of the tenant's reducing the crops to cash and then giving petitioner its share of the total receipts collected. It is not, as respondent argues, a percentage of profits or net income.

Although case law on the passive rent test is sparse,[3] the facts in *Moore Charitable Trust v. United States,* 812 F. Supp. 130 (C.D. Ill. 1993), are on point. The lease called for rents based on 50 percent of the farm production after the crop is divided at the grain elevator. Certain costs, including seed and fertilizer, were divided equally between the taxpayer and the farmer.

The court found that the rents from the farm operation are true rents that are based on a fixed percentage of receipts from the farm *before either party considers* its independent operating expenses. The court further established that the rent paid in the form of crops is more analogous to receipts than to income or profits. The court concluded that the rent is exempt from UBIT because it falls within the parenthetical language of section 512(b)(3)(A)(i) and (B)(ii) and is exempt from UBIT.

In view of the foregoing, we hold that the passive rent test was not violated since petitioner's rent was not determined,

---

[3] See *State National Bank of El Paso v. United States,* 509 F.2d 832 (5th Cir. 1975) (where the lease provided for rents based on profits, the Court of Appeals reversed the District Court's findings in favor of the taxpayer, stating that reasonable people could differ on the interpretation of the lease agreement (i.e., partnership or landlord-tenant); this case was decided under the pre-1969 version of sec. 512(b)(3)); *Ohio County & Independent Agriculture Societies, Delaware County Fair v. Commissioner,* T.C. Memo. 1982-210 (where the lease explicitly provided for rent based on net profits. Accordingly, we held that the rent was not excluded from UBIT.); *Independent Order of Odd Fellows Grand Lodge of Iowa v. United States,* 1991 U.S. Dist. Lexis 14958 (S.D. Iowa 1991) (where the issue was whether rents received from sharecrop leases were taxable as unrelated business income. However, the opinion in that case, denying cross-motions for summary judgment, includes only a brief discussion of the merits of the claims.).

in whole or in part, on the net profits or income derived from the property.

### C. *Conclusion*

Rents are excluded from UBIT if: (1) The rents are in substance rents, not a return on profits by the tenant or a share of profits received by the landlord as either a joint venture or partnership, and (2) the rents do not violate the passive rent test of section 512(b)(3)(B)(ii). We found the agreements petitioner and the tenant entered into were sharecrop leases creating a landlord-tenant relationship with the payments thereunder representing rents. We further found that the passive rent test was not violated since petitioner's rent was not determined in whole or in part by net profits or net income.

Accordingly, we conclude that the rents in issue are excluded from UBIT pursuant to section 512(b)(3)(A)(i).

In view of petitioner's concession of liability for the excise taxes determined under section 4942,

*Decision will be entered under Rule 155.*