106 T.C. No. 11


UNITED STATES TAX COURT


OHIO FARM BUREAU FEDERATION, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 18614-93.                    Filed April 11, 1996.


     P, a tax-exempt agricultural organization, engaged
in activities to promote the use of agricultural
cooperatives among farmers.  In 1934, P formed L, a
statewide cooperative.  In 1949, P and L entered into a
written contract, whereby P agreed to perform
educational and promotional activities on behalf of L
in exchange for a fee.  Pursuant to the contract, P
performed activities to promote cooperatives in general
and L specifically.

     In 1985, L merged into another cooperative.  In
connection with the merger, P and L formally terminated
their contractual relationship pursuant to a written
termination agreement.  The termination agreement
contained a nonsponsorship and noncompetition clause,
whereby P agreed not to sponsor or promote a competing
cooperative on an exclusive basis.  In consideration
for the nonsponsorship and noncompetition agreement, P
received $2,064,500.

Held:  The fees received by P pursuant to its service contract with L were substantially related to its tax-exempt purpose and, therefore, did not constitute unrelated business taxable income.

Held, further:  P's fulfillment of the nonsponsorship and noncompetition clause did not constitute a trade or business as defined by sec. 513, I.R.C.; therefore, the payment did not constitute unrelated business taxable income taxable to P under sec. 511(a), I.R.C.

James R. King, Michael Dubetz, Jr., and Todd S. Swatsler, for petitioner.

Robert D. Kaiser, for respondent.

RUWE, Judge:  Respondent determined deficiencies in petitioner's Federal income tax in the amounts of $1,107,505 and $40,192 for the taxable periods ending August 31, 1985, and August 31, 1986, respectively.

After concessions, the issues for decision are: (1) Whether the $292,617 received by petitioner pursuant to its service contract with Landmark, Inc., during the taxable year ending August 31, 1985, constituted unrelated business taxable income; (2) whether a lump-sum payment made by Landmark, Inc., to petitioner pursuant to the terms of a nonsponsorship and noncompetition clause contained in their 1985 termination agreement constituted unrelated business taxable income; and (3) whether interest should be computed under the provisions of

section 6621(c),[1] dealing with large corporate underpayments, for the taxable period ending August 31, 1985.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the petition was filed, petitioner's principal place of business was in Columbus, Ohio.

Petitioner is the Ohio Farm Bureau Federation, Inc., a nonprofit agricultural organization exempt from Federal income tax under section 501(c)(5). Petitioner was formed in 1919 as an unincorporated association and subsequently incorporated under Ohio law on November 27, 1931. Petitioner is a statewide federation of local county farm bureaus (county bureaus). Individual farmers are not members of petitioner. Instead, farmers (or other persons fulfilling certain eligibility requirements) are members of the county bureaus, which, in turn, are members of petitioner.

Petitioner's stated purpose was generally to aid and assist in the betterment of the conditions and welfare of those engaged in agriculture. More specifically, petitioner engaged in activities to educate Ohio farmers and to promote agricultural

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable period in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

cooperatives and cooperative activity among Ohio farmers. An agricultural cooperative is a business organization in which the members, who are generally individual farmers, are both owners of the organization and its customers. The farmer-owners sell products to, and purchase products and supplies from, the cooperative. A farmer's ownership interest in the cooperative is determined by the amount of business he or she does with the cooperative. Petitioner has historically encouraged farmers to join cooperatives, pointing out the benefits of ownership, the availability of products or services that may not otherwise be available to farmers, and the focus on keeping farmers' needs and interests primary. In fact, petitioner was the founder or sponsor of most of the agricultural cooperatives in Ohio.

In 1934, petitioner formed an Ohio agricultural cooperative by the name of the Ohio Farm Bureau Cooperative Association, Inc. The name was later changed to Landmark, Inc. (Landmark). Landmark was a regional cooperative organization. As such, it did not generally sell products to or purchase products from individual farmers. Instead, local Landmark cooperatives or affiliated organizations (local Landmarks) purchased from or sold to individual farmers.

From the time of Landmark's formation until December 5, 1981, petitioner held a controlling interest in Landmark's voting

common stock and also held some preferred shares.[2]  Petitioner

and Landmark shared common management until 1955.  During the

taxable year in issue, petitioner and Landmark shared office

space pursuant to a contract dated December 5, 1981, between

petitioner and Landmark.

During the year in issue, local Landmarks were located

throughout the State of Ohio, making Landmark the only regional

cooperative in Ohio that had local affiliates located throughout

the State.  Landmark, as the regional organization, dealt

principally with petitioner, rather than with the county bureaus.

The local Landmarks worked with the county bureaus throughout the

State in a similar mutual and cooperative manner.  Most of the

farmers who were members of the county bureaus were also members

of the local Landmarks.

On November 15, 1949, petitioner and Landmark (then known as

the Farm Bureau Cooperative Association, Inc.) entered into a

written service contract, whereby petitioner agreed to "perform

services on behalf of * * * [Landmark] in the fields of

education, promotion, organization, publicity and public

relations for the purpose of aiding in the purchasing and

marketing activities of * * * [Landmark]."  Specifically,

petitioner agreed to (1) disseminate information to Ohio farmers

---

[2]Petitioner continued to hold Landmark preferred shares
until such shares were exchanged for Countrymark stock pursuant
to a merger in 1985.  See infra p. 9.

with respect to economic and social conditions, results of agricultural research, methods of producing, marketing, and selling agricultural products, and methods for financing agricultural operations; (2) provide education, including education for the purpose of promoting the marketing and sale of agricultural products handled by Landmark; (3) make available to Landmark its mailing list; (4) maintain a publicity department to encourage the handling of Landmark merchandise; (5) publish advertisements of Landmark (at standard advertising rates) and news items about Landmark (as offered and agreed upon) in its news publication; (6) maintain a public relations program relating to farm cooperatives; and (7) promote research in agricultural fields and cooperatives generally.  In consideration of the performance of these services by petitioner, Landmark agreed to pay the sum of 1/4 of 1 percent of its purchasing volume and 1/16 of 1 percent of its marketing volume.

The November 15, 1949, contract represented the first written agreement between the parties; however, the working relationship memorialized in the agreement actually predated the writing.  The written service contract was amended on January 1, 1980, and again on December 5, 1981.  The only material change made by these amendments was in the calculation of the fee to be paid to petitioner.  The 1980 amendment changed the amount of the fee to a percentage of Landmark's gross margin, and the 1981 amendment changed the amount to correspond to a fixed payment

schedule.  The 1981 amendment was in effect during the taxable year in issue.

Pursuant to the service contract, petitioner engaged in various types of educational programs, which directly or indirectly promoted cooperatives.  For example, petitioner conducted youth camps, where cooperatives and cooperative issues were explained, and children were given the opportunity to operate a small-scale cooperative.  Petitioner also conducted conferences for young couples dedicated to farming.  These conferences were jointly sponsored with Landmark and included discussion about cooperatives.  In addition, petitioner sponsored advisory council meetings, in which small, voluntary groups of farmers gathered to discuss farm topics.  Petitioner would suggest topics for discussion at these meetings, including cooperative issues in general and assessment of the performance of the local cooperative organizations.

Petitioner also engaged in various public relations activities to promote cooperatives pursuant to the service contract.  For example, C. William Swank, petitioner's executive vice president and chief executive officer, and other staff members of petitioner frequently spoke about cooperative issues to farmer groups, university groups and classes, and service clubs.  Moreover, petitioner's primary publication, the Buckeye Farm News, included frequent editorial discussions about cooperative ideas in general and about Landmark in particular.

Petitioner made editorial space available to Landmark, so that it could include its own discourse on cooperatives as well as discussions of its general business. Petitioner also invited representatives from Landmark and other cooperative organizations to speak about cooperative issues at its farm bureau meetings.

In addition, pursuant to the service contract, petitioner undertook various legislative efforts in cooperation with Landmark. On several occasions, they were successful in securing passage of legislation beneficial to Ohio farmers.

In conducting its activities pursuant to the service contract, petitioner continuously emphasized the cooperative form of doing business. In this connection, petitioner would often mention Landmark specifically and permit Landmark representatives to communicate with petitioner's members through editorials in the Buckeye Farm News and through appearances at youth camps and other meetings. Petitioner would also refer its members to Landmark. The nature of petitioner's activities under the service contract did not materially change from the time the contract was executed in 1949 until the time it was terminated in 1985.

Petitioner had a similar service agreement with another, much smaller agricultural cooperative, known as the Ohio Agricultural Marketing Association. This agreement served significantly fewer people and generated much smaller fees than did petitioner's service contract with Landmark.

In 1985, Landmark merged into another agricultural cooperative, the Ohio Farmers Grain and Supply Association, Inc. (Ohio Farmers). The name of the surviving entity was changed to Countrymark. Prior to the merger, Landmark had cooperative facilities throughout the State of Ohio, whereas Ohio Farmers' activities were limited to northwest Ohio. The two cooperative organizations were competitive to the extent that Landmark operated facilities in northwest Ohio; however, Ohio Farmers coexisted with Landmark in only about 15 percent of the counties in Ohio. The merger eliminated most of the cooperative competition in Ohio.

In connection with the merger, petitioner's relationship with Landmark was formally terminated pursuant to a written termination agreement, dated February 20, 1985. The preamble to the agreement contained the following recital:

> [Petitioner] and Landmark have had a close working relationship since 1934. Until 1955, they shared common management. Thereafter, the close relationship continued under a service/sponsorship agreement providing for [petitioner] to perform a wide variety of services in the promotion and advancement of Landmark, its products and services. During the duration of the relationship [petitioner] has been privy to many of Landmark's business plans and programs, its trade secrets, customer lists of its members, price lists and other confidential trade practices and has promoted, exclusively, the Landmark system and its products and services.

Under the termination agreement, petitioner and Landmark agreed, among other things, to terminate their service contract. The

termination agreement also contained a nonsponsorship and noncompetition provision, which provided in pertinent part:

> Section 5.  Non-Sponsorship/Non-Competition.
> [Petitioner], for and upon receipt of the consideration
> specified in Section 6.2 below, agrees that for a
> period of three (3) years from the Effective Date that
> (except for the benefit of Landmark or its successors)
> it will not participate in the ownership, management,
> operation, control, or sponsorship of any agri-business
> enterprise engaged in grain marketing, feed
> manufacturing, fertilizer manufacturing or
> distribution, or farm chemical or petroleum
> distribution at the "regional cooperative level" * * *
> nor will it, at the regional or local level * * *
> during such three year period, within the State of
> Ohio, sponsor or promote, on an exclusive basis, a
> specific competing enterprise or products or services
> of the type and character described above.  Nothing
> herein shall be construed to prohibit or prevent
> [petitioner's] support for and promotion of
> cooperatives and their products and services on a non-
> exclusive basis within the agri-business community;
> promotion of and education of the public about
> agriculture, its needs and concerns; the conduct of any
> programs or activities which [petitioner] now conducts
> * * *

In consideration for the covenants contained in this provision, petitioner received $2,064,500.[3]

Since entering the termination agreement on February 20, 1985, petitioner has continued to conduct educational, promotional, and other activities with respect to agricultural

---

[3]Petitioner received an additional $633,600 under the termination agreement in consideration for certain rights to additional preferred stock of Landmark and for petitioner's assignment of all its voting rights in Landmark to a voting trust provided for in the termination agreement.  This payment is not in issue.

and other cooperatives.  Petitioner has also afforded some visibility to Countrymark, the merged entity, by mentioning it in the Buckeye Farm News and permitting Countrymark representatives to appear at petitioner's youth camps and annual meetings.

OPINION

The parties agree that petitioner is a "Labor, agricultural, or horticultural" organization exempt from tax pursuant to section 501(c)(5).  Such organizations are described in the regulations as those that (1) have no net earnings inuring to the benefit of any member and (2) have as their objects the betterment of the conditions of those engaged in agricultural pursuits, the improvement of the grade of their products, and the development of a higher degree of efficiency in their occupations.  Sec. 1.501(c)(5)-1, Income Tax Regs.

Notwithstanding this general exemption from taxation, section 511(a) imposes a tax on the "unrelated business taxable income" (UBTI) of section 501(c)(5) organizations.  UBTI is defined in section 512(a)(1) as "the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, less the deductions * * * which are directly connected with the carrying on of such trade or business".  Section 513(a), in turn, defines "unrelated trade or business" as "any trade or business the conduct of which is not substantially related * * * to the exercise or performance

by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption".

The regulations and the case law have delineated the three elements necessary for income from an activity to be UBTI: (1) The activity from which the income is derived is a trade or business, (2) the trade or business is regularly carried on by the organization, and (3) the conduct of the trade or business is not substantially related to the organization's tax-exempt purpose, other than through the need for or use of the funds it produces. United States v. American Bar Endowment, 477 U.S. 105, 110 (1986); National Water Well Association v. Commissioner, 92 T.C. 75, 83 (1989); sec. 1.513-1(a), Income Tax Regs. UBTI exists only if all three elements are found. Veterans of Foreign Wars, Mich. v. Commissioner, 89 T.C. 7, 19-20 (1987). Petitioner bears the burden of proving that one or more of the elements above is lacking. Rule 142(a).

## Payments Under the Service Agreement

The first issue we must decide is whether the $292,617 received by petitioner during 1985 pursuant to its service agreement with Landmark constituted UBTI. There appears to be no dispute that the services performed by petitioner pursuant to the service agreement constituted a trade or business and were regularly carried on. Thus, the focus of our discussion is limited to whether or not petitioner's performance of those

services was substantially related to its tax-exempt purpose as an agricultural organization under section 501(c)(5).

For a substantial relationship to exist, the activity that produces the income "must contribute importantly to the accomplishment of * * * [the organization's exempt] purposes." Sec. 1.513-1(d)(2), Income Tax Regs. The regulations describe the type of relationship that qualifies as substantial:

> Trade or business is "related" to exempt purposes, in the relevant sense, only where the conduct of the business activities has causal relationship to the achievement of exempt purposes (other than through the production of income); and it is "substantially related," for purposes of section 513, only if the causal relationship is a substantial one. * * * [Sec. 1.513-1(d)(2), Income Tax Regs.]

The substantial relationship requirement focuses upon the manner in which the tax-exempt organization conducts its activities. United States v. American College of Physicians, 475 U.S. 834, 848-849 (1986).

In cases involving business leagues, courts have identified two factual elements that are important to the substantial relationship determination: (1) Whether the activities in question are "unique" to the organization's tax-exempt function, and (2) whether the activities benefit the common business interest of an organization's membership or the industry as a whole and not just members in their individual capacities. Professional Ins. Agents of Mich. v. Commissioner, 726 F.2d 1097,

1103 (6th Cir. 1984), affg. 78 T.C. 246 (1982); <u>Louisiana Credit</u>

<u>Union League v. United States</u>, 693 F.2d 525, 535 (5th Cir.

1982).[4]

With respect to the uniqueness test, it has been stated
that:

> Such services as educational and training programs,
> legislative lobbying, and institutional advertising
> clearly satisfy this uniqueness test, because they
> advance the purposes of the * * * [organization] as an
> entity in itself.  It is the institutional ends that
> must be served if the activity is to be deemed
> substantially related.  Educational, legislative, and
> advertising services are peculiarly suitable activities
> for a business league because they further the common
> business interest that unites the association's
> members.  * * *  [<u>Louisiana Credit Union League v.</u>
> <u>United States</u>, <u>supra</u> at 535; see also <u>Professional Ins.</u>
> <u>Agents of Mich. v. Commissioner</u>, <u>supra</u> at 1103.]

Petitioner's stated purpose was generally to aid and assist

in the betterment of the conditions and welfare of those engaged

in agriculture.  The affidavit upon which petitioner's tax

exemption was based defined petitioner's purposes to include "the

sponsorship of * * * Purchasing and Marketing cooperatives".  The

primary thrust of petitioner's activities under the service

contract was to educate Ohio farmers about agricultural

cooperatives in general, and Landmark specifically, and to

_____

[4]While the cases cited deal with business leagues under sec.
501(c)(6), which are associations of persons having common
business interests, we have stated that this substantial
relationship analysis is relevant for purposes of sec. 501(c)(5)
agricultural organizations as well.  <u>California Thoroughbred</u>
<u>Breeders Association v. Commissioner</u>, T.C. Memo. 1989-342.

promote cooperative activity among the farmers. Petitioner believed that the use of cooperatives was beneficial to farmers, as evidenced by its historical involvement in the cooperative movement in Ohio. We think that petitioner is in a unique position to perform the activities under the service contract given its distinctive relationship with Ohio farmers, and we find the activities to be unique to petitioner's tax-exempt function.

In evaluating the relationship between the activities and the purposes of an agricultural organization, the capacity in which benefits are received by the organization's members is as important as the unique character of the organization's activities. For a substantial relationship to exist, the benefits flowing from the organization's activities must inure to the members as a group, rather than as individuals. Professional Ins. Agents of Mich. v. Commissioner, supra at 1103-1104; Louisiana Credit Union League v. United States, supra at 535-536. Several factors are relevant in determining whether an activity operates primarily to benefit individual members: (1) Whether fees charged are directly proportionate to benefits received; (2) whether participation is limited to members and, thus, is of no benefit to nonmembers in the industry; and (3) whether the service provided is one commonly provided by for-profit entities. Illinois Association of Professional Ins. Agents v. Commissioner, 801 F.2d 987, 993 (7th Cir. 1986), affg. T.C. Memo. 1985-105; Carolinas Farm & Power Equip. Dealers v. United States, 699 F.2d

167, 171 (4th Cir. 1983).

In the present case, the only fees paid to petitioner by its members were membership dues. The benefits that petitioner's members might receive from petitioner's educational, promotional, and lobbying activities performed pursuant to the service contract could turn out to be negligible, or they could far outweigh the amount of their dues. The benefits were not directly proportional to the amount of the fees paid. Moreover, petitioner's activities in lobbying for and promoting cooperative activity would benefit the entire agricultural industry, not just its members, and it is a service not commonly provided by for-profit entities.

Respondent argues that, pursuant to the service contract, petitioner agreed to promote exclusively Landmark and its products and services, and that the manner in which petitioner conducted its activities was primarily for the commercial benefit of Landmark, rather than for the purposes underlying petitioner's exemption. Respondent cites Illinois Association of Professional Ins. Agents v. Commissioner, supra and National Water Well Association v. Commissioner, 92 T.C. at 97-98, to support her argument.

In Illinois Association of Professional Ins. Agents v. Commissioner, supra, the Court of Appeals for the Seventh Circuit held that the manner in which the taxpayer, a business league exempt under section 501(c)(6), conducted its errors and

omissions insurance activities indicated that the activities were not substantially related to the taxpayer's exempt purpose. The court based its determination on the fact that the taxpayer endorsed a particular errors and omissions program in a manner that provided convenient marketing, advertising, and administrative services to the insurance company and that generated income for the taxpayer rather than educating the taxpayer's members, serving the public interest, or merely advising of the need for such coverage. Illinois Association of Professional Ins. Agents v. Commissioner, supra at 995. The court further noted that the program benefited the individual members in direct proportion to the fees they paid, rather than benefiting the members as a group. Id.

Similarly, in National Water Well Association v. Commissioner, supra, this Court held that the taxpayer's endorsement and sponsorship of a particular industry casualty insurance program was not substantially related to its exempt purpose. In so holding, we noted that had the taxpayer intended to educate and advise its members of the need for casualty industry insurance, it would have advised its members of various types of insurance from which its members could select. National Water Well Association v. Commissioner, supra at 98. Moreover, only those individuals who paid premiums received insurance under the industry casualty insurance program; therefore, the members were not benefited as a group. Id. at 98-99.

We find these cases to be distinguishable from the instant case, because petitioner did educate its members and promote the use of cooperatives in general.  Unlike the promotion of a particular commercial insurance program, petitioner's promotion of Landmark was uniquely related to its exempt purpose.  Most Ohio farmers who were members of county bureaus were also members of local Landmark cooperatives.  Landmark was the only statewide regional agricultural cooperative in Ohio and was regularly held up by petitioner as the exemplar of the successful cooperative. Indeed, the only other regional agricultural cooperative, Ohio Farmers, coexisted with Landmark in only about 15 percent of the counties in Ohio.  Petitioner's promotion of Landmark was thus done in conjunction with its promotion of cooperatives in general.  Indeed, petitioner continued to promote cooperatives after it terminated its relationship with Landmark, and petitioner often singled out Countrymark, the newly merged statewide cooperative.  Moreover, unlike the cases above, the benefits received by petitioner's members were not directly proportional to the amount of the fees paid, and the members benefited as a group from petitioner's activities.

Payments under the Nonsponsorship Clause

In determining whether the payment made by Landmark to petitioner pursuant to the terms of the nonsponsorship and noncompetition clause contained in their 1985 termination

agreement constituted UBTI, we must first decide whether the income was derived from a trade or business.

Section 513(c) defines the term "trade or business" as any activity that is carried on for the production of income from the sale of goods or the performance of services.  The regulations provide that, as a general rule, an activity that qualifies as a trade or business under section 162 also qualifies as a trade or business under section 513.  Sec. 1.513-1(b), Income Tax Regs. In setting out the test for a trade or business under section 162, the Supreme Court has stated:

> Of course, not every income-producing and profit-making endeavor constitutes a trade or business.  The income tax law, almost from the beginning, has distinguished between a business or trade, on the one hand, and "transactions entered into for profit but not connected with . . . business or trade," on the other. See Revenue Act of 1916, § 5(a), Fifth, 39 Stat. 759. Congress "distinguished the broad range of income or profit producing activities from those satisfying the narrow category of trade or business."  Whipple v. Commissioner, 373 U.S., at 197.  We accept the fact that to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit. A sporadic activity, a hobby, or an amusement diversion does not qualify.  [Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); emphasis added.]

Because the purpose of the unrelated business income tax was to prevent tax-exempt organizations from unfairly competing with businesses whose earnings were taxed, United States v. American Bar Endowment, 477 U.S. at 114, we have considered the potential

for unfair competition as a factor in determining whether a trade or business exists. National Water Well Association v. Commissioner, 92 T.C. at 86.

The question of whether noncompetition under a covenant not to compete constitutes a trade or business appears to be an issue of first impression. Respondent argues that the determinative factor is whether the activity was engaged in with an intent to earn a profit, and the allocation of $2,064,500 to the nonsponsorship and noncompetition clause clearly shows petitioner's profit motive.

While profit motive is an important factor in the trade or business analysis, the Supreme Court made it clear that the level of activity remains an important component of the trade or business standard. Commissioner v. Groetzinger, supra at 35; see also Professional Ins. Agents of Mich. v. Commissioner, 726 F.2d at 1102; National Water Well Association v. Commissioner, supra at 84. We simply do not think that a one-time agreement not to engage in certain activities constitutes the kind of continuous and regular activity characteristic of a trade or business. Nor does noncompetition involve a "sale of goods" or "performance of services" as set out in the definition of trade or business in section 513(c). Moreover, we simply do not see how an agreement not to compete creates a potential for unfair competition with a taxable entity.

We are aware that a negative covenant to refrain from

performing services has been held to be the equivalent of affirmative personal services. Patterson v. Commissioner, 810 F.2d 562, 569 (6th Cir. 1987), affg. T.C. Memo. 1985-53; Salvage v. Commissioner, 76 F.2d 112, 113-114 (2d Cir. 1935), affd. 297 U.S. 106 (1936); Cox v. Helvering, 71 F.2d 987, 988 (D.C. Cir. 1934); Ullman v. Commissioner, 29 T.C. 129, 139 (1957), affd. 264 F.2d 305 (2d Cir. 1959). However, this rule has been applied only for purposes of determining that a payment received for such a covenant constitutes income to the recipient.[5] Such application is appropriate given the exceedingly broad definition of income. The definition of trade or business, on the other hand, is more narrow as noted by the Supreme Court in Commissioner v. Groetzinger, supra at 35. We, therefore, decline to treat the absence of activity resulting from a covenant not to compete as equivalent to the affirmative performance of such activity for purposes of applying the definition of a trade or business in this context. Accordingly, we find that the payment made by Landmark to petitioner pursuant to the terms of the nonsponsorship and noncompetition clause contained in their 1985

---

[5]Similarly, in Schaefer v. Commissioner, 105 T.C. 227 (1995), we sustained a Treasury regulation under which income from a covenant not to compete is not considered "passive" income for purposes of sec. 469. In Schaefer, we dealt only with the validity of a regulation that specifically classified income from a covenant not to compete as nonpassive income. We did not deal with the more narrow question of whether the income from such a covenant is derived from a trade or business regularly carried on within the meaning of the unrelated business income tax, which confronts us in the present case.

termination agreement was not derived from a trade or business and, therefore, does not constitute UBTI.

For similar reasons, we do not think that the nonsponsorship and noncompetition clause met the second requirement for UBTI-- that the trade or business be "regularly carried on" by the organization. The regulations provide guidance in deciding whether an activity is regularly carried on within the meaning of section 512:

> regard must be had to the <u>frequency and continuity</u> with which the activities productive of the income are conducted and the manner in which they are pursued. This requirement must be applied in light of the purpose of the unrelated business income tax to place exempt organization business activities upon the same tax basis as the nonexempt business endeavors with which they compete. * * *
>
> * * * * * * *
>
> Certain intermittent income producing activities <u>occur so infrequently that neither their recurrence nor the manner of their conduct will cause them to be regarded as trade or business regularly carried on.</u> For example, income producing or fund raising activities lasting only a short period of time will not ordinarily be treated as regularly carried on if they recur only occasionally or sporadically. * * * [Sec. 1.513-1(c)(1), (2)(iii), Income Tax Regs.; emphasis added.]

The nonsponsorship and noncompetition clause was part of a termination agreement entered into between petitioner and Landmark.  Such a one-time agreement is clearly not the sort of frequent and continuous activity contemplated by the regulations. Rather, it is a single, isolated event that occurred as a result of the unique relationship between petitioner and Landmark.

Our conclusion is consistent with analogous cases involving self-employment taxes.  In Newberry v. Commissioner, 76 T.C. 441, 444 (1981), the issue was whether the proceeds from business interruption insurance that the taxpayer received after his store was destroyed by fire constituted "gross income derived by an individual from any trade or business carried on by such individual" pursuant to section 1402(a).  We held that the quoted language of section 1402(a) required a causal nexus between the income and actual business activity and that such a requirement had not been met.[6]  The statutory language in section 1402(a) is quite similar to the definition of unrelated business income in section 512(a),[7] and we believe that the rationale in Newberry v. Commissioner, supra, is equally applicable to the instant case.[8]

---

[6]See also Milligan v. Commissioner, 38 F.3d 1094 (9th Cir. 1994), revg. T.C. Memo. 1992-655.

[7]Sec. 512(a) defines "unrelated business income" as "gross income derived by any organization from any unrelated trade or business * * * regularly carried on by it".

[8]See also Barrett v. Commissioner, 58 T.C. 284, 289 (1972), wherein this Court noted:  "Both parties agree that
(continued...)

Accordingly, we hold that petitioner did not have UBTI during the taxable year in issue.[9]

Decision will be entered

under Rule 155.

---

[8](...continued) noncompetition does not constitute the carrying on of a trade or business."

[9]Because we have found that there was no underpayment of petitioner's income tax, we need not address whether interest should be computed under the provisions of sec. 6621(c), dealing with large corporate underpayments.