[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-10786

_____

Agency No. 13256-14

K. SLAUGHTER,

Petitioner-Appellant,

versus

COMMISIONER OF IRS,

Respondent-Appellee.

_____

Petition for Review of a Decision of the
United States Tax Court

_____

(August 3, 2021)

Before JORDAN, BRASHER, and JULIE CARNES, Circuit Judges.

BRASHER, Circuit Judge:

Karin Slaughter appeals the tax court's decision that she owes almost

$190,000 in self-employment taxes for 2010 and 2011. She argues that the tax court

erred in determining that (1) her trade or business included promotional activities in

2010 and 2011 and (2) all of her publishing income during those years was derived from her trade or business. Slaughter's arguments are without merit. Accordingly, we affirm the tax court's decision.

## I. BACKGROUND

Slaughter is a bestselling crime fiction author who lives in Georgia. During the years relevant to this appeal, Slaughter received income for her books through contracts with publishers. Her contractual obligations varied with the publisher. For English-language publishers, Slaughter was required to write an original manuscript for a book. If the manuscript was delivered to and accepted by the publisher, she received a fixed advance payment in installments specified in her contract. Slaughter also received royalties or subsidiary rights income from those sales if they exceeded her advance. For foreign-language publishers, Slaughter also received similar advances in exchange for the right to print, publish, and sell a foreign-language translation of one of her existing books.

Since signing her first publishing contract in 1999, Slaughter has retained the same literary agent to help promote her work with publishers, booksellers, and book reviewers. Slaughter and her agent promote her brand in several ways: maintaining contact with her readership through her website, newsletter, and social media presence; giving interviews; attending promotional and publicity events; giving gifts to business associates and inviting publishers to stay with her in her home; renting

2

an apartment in New York City to attend trade shows and meet publishers there; and paying for a promotional bus poster. Significantly, Slaughter claimed business-expense deductions for all of those activities on her income tax returns for 2010 and 2011.

In 2010, Slaughter received $5,425,652 from her publishing contracts after deducting her agent's fees and expenses. But on her income tax return for that year, she reported only $875,000 as gross business income. After deductions, she calculated a self-employment tax of $18,725 on that income and reported the remaining $4,550,653 as supplemental income. She did not report self-employment tax on the supplemental income.

In 2011, she received $3,623,039 from her publishing contracts after deduction of her agent's fees and expenses. But on her income tax return for that year, she reported only $930,000 as gross business income. After deductions, she calculated a self-employment tax of $17,882 on that income and reported the remaining $2,693,039 as supplemental income. She again did not report self-employment tax on the supplemental income.

In allocating Slaughter's publishing income for both returns, her accountants began with the fact that she took 12 to 15 weeks to write a book and wrote approximately one book per year. For her 2010 return, they assumed that Slaughter worked five days a week for 12 weeks, meaning that she worked 60 days that year.

And because 60 days is about 16.43% of a 365-day year, they reported that percentage of Slaughter's publishing income as her gross business income. For her 2011 return, they used the same method but calculated a higher percentage of publishing income to report as her gross business income because Slaughter had spent more time writing that year.

The IRS concluded that for both returns, Slaughter should have reported all of her publishing income as gross business income instead of just the percentage based on how long she engaged in the physical labor of writing. It issued a notice of deficiency to Slaughter and increased her self-employment taxes accordingly.

Slaughter then filed a petition in the United States Tax Court for redetermination of the deficiencies asserted in the notice, and a trial was scheduled. In her pre-trial memorandum, Slaughter argued that only part of her income for her "writing services" should be subject to self-employment tax. The IRS argued in its pre-trial memorandum that Slaughter's entire income from her publishing contracts was subject to self-employment tax because it was derived from her trade or business. It further argued that payments to Slaughter for various intangible assets were subject to self-employment tax because those rights were a part of her trade or business.

At trial, both parties reiterated and clarified their respective arguments in their opening statements. Slaughter specifically insisted that her only trade or business

was writing. The IRS agreed that Slaughter was in the trade or business of writing, but it rejected Slaughter's argument that her "writing" business consisted only of the physical labor of writing and that her marketing and licensing fell outside that trade or business.

After the trial and submission of post-trial briefing, the tax court held that all of Slaughter's publishing income was subject to self-employment tax because her brand, her promotional activities to promote it, and the licensing of most of her intangible assets were part of her trade or business. Slaughter filed a motion for reconsideration in which she argued that the IRS had "stipulated" at trial and in its briefs that her only business was "writing." The tax court denied her motion and entered a decision stating that Slaughter owed almost $190,000 in self-employment tax. Slaughter timely appealed.

## II. STANDARD OF REVIEW

"We review decisions of the Tax Court in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." *Long v. Comm'r*, 772 F.3d 670, 675 (11th Cir. 2014) (internal quotation marks omitted) (quoting 26 U.S.C. § 7482(a)(1)). Accordingly, we review the tax court's legal conclusions *de novo* and its findings of fact for clear error. *See Palmer Ranch Holdings Ltd v. Comm'r*, 812 F.3d 982, 993 (11th Cir. 2016). "The application of the law to the facts, however, is subject to *de novo* review." *Pope v. Hightower*, 101

F.3d 1382, 1383 (11th Cir. 1996). Finally, the tax court's denial of a motion for reconsideration is reviewed for abuse of discretion. *Cf. Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1254 (11th Cir. 2007) ("We review a district court's denial of a motion for reconsideration for abuse of discretion.").

### III. DISCUSSION

Under 26 U.S.C. § 1401, a tax "shall be imposed for each taxable year, on the self-employment income of every individual[.]" Generally speaking, "[t]he term 'self-employment income' means the net earnings from self-employment derived by an individual," and "[t]he term 'net earnings from self-employment' means the gross income derived by an individual from any trade or business carried on by such individual, less the deductions . . . attributable to such trade or business[.]" 26 U.S.C. § 1402(a), (b). "The self-employment tax provisions are broadly construed to favor treatment of income as earnings from self-employment." *Peterson v. Comm'r*, 827 F.3d 968, 986 (11th Cir. 2016).

On appeal, Slaughter argues that most of her publishing income is not subject to the self-employment tax described above. Before turning to her arguments for that conclusion, we first address a preliminary issue. Slaughter argues that the IRS stipulated in the tax court proceedings that she was in the trade or business of writing only. She then argues that the IRS dispositively conceded that her trade or business included only the physical labor of writing and not any promotional activities. She

6

further argues that the tax court erred in rejecting the IRS's stipulation in its denial of her motion for reconsideration. If Slaughter were correct, then she would prevail because any income that was not from her physical labor of writing would not be subject to self-employment tax.

But she is not correct for the following two reasons.

First, the IRS always made clear that although it agreed that Slaughter's business was writing, it disagreed with her about what that writing business entailed. For example, immediately after agreeing with Slaughter's proposed finding that "she was not in any business other than writing," the IRS objected in detail to her next proposed finding, that she was "not in the business of selling books." Even if the IRS's agreement with the first proposed finding were a stipulation, that stipulation must be read in light of the IRS's objection to the second proposed finding. *Gomez v. Rivera Rodriguez*, 344 F.3d 103, 121 (1st Cir. 2003) ("Stipulations are best understood as the analogue of terms binding parties to a contract. Accordingly, the interpretation of a stipulation follows general contract law principles. It is axiomatic that a contractual term should be construed in the context of the contract as a whole. Every term should be given effect, and, thus, separate clauses should be reconciled whenever possible." (internal quotation marks and citations omitted)).

Second, Slaughter's view of the record would make the litigation below unintelligible. A major issue argued before the tax court was whether Slaughter's

7

trade or business included promotional activities in 2010 and 2011. And the IRS argued repeatedly and consistently that it did. But if—as Slaughter contends—the IRS later conceded that her trade or business did not include promotional activities, then its previous attempts to litigate that issue would have been pointless because there would have been nothing to litigate. That consequence strongly disfavors Slaughter's interpretation. *Cf. United States v. One 1978 Bell Jet Ranger Helicopter, Serial No. 2464, License No. N500RF*, 707 F.2d 461, 463 (11th Cir. 1983) ("In construing [a] stipulation, every effort should be made to effectuate the intent of the parties, and a permissible interpretation which makes it operative is preferred over one which makes it meaningless." (cleaned up) (quoting *United States v. Reading Co.*, 289 F.2d 7, 9 (3d Cir. 1961)).

Accordingly, we conclude that even if the IRS's statements could be construed as a stipulation, the IRS merely conceded that Slaughter was in the trade or business of writing and in no way agreed with any particular definition of writing—let alone Slaughter's very narrow definition. We now turn to Slaughter's two remaining arguments.

### A. Slaughter's Trade or Business Included Promotional Activities

Slaughter argues that the tax court erred in finding that her trade or business included promotional activities in 2010 and 2011. Section 1402(c) defines "[t]he term 'trade or business,' when used with reference to self-employment income or

8

net earnings from self-employment" to "have the same meaning as when used in section 162" of the Tax Code, with limited exceptions that are not applicable to this appeal. 26 U.S.C. § 1402(c). The Supreme Court has held that to be engaged in a trade or business under Section 162, "the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit." *Comm'r v. Groetzinger*, 480 U.S. 23, 35 (1987). "A sporadic activity, a hobby, or an amusement diversion does not qualify." *Id.*

Here, Slaughter argues that her trade or business does not include promotional activities because they were only sporadic and occasional rather than continuous and regular. And she further argues that when the tax court found otherwise, it failed to provide specific details about the time, duration, and frequency of her promotional activities or explain why those activities were continuous and regular in 2010 and 2011.

This argument is unpersuasive for two reasons.

First, determining whether an activity is sufficiently continuous and regular to constitute a trade or business "requires an examination of the facts in each case." *Id.* at 36 (quoting *Higgins v. Comm'r*, 312 U.S. 212, 217 (1941)). Consequently, we review the tax court's findings on that issue for clear error. "A factual finding is clearly erroneous when a review of the entire record leaves us with the definite and

9

firm conviction that a mistake has been committed." *Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1357 (11th Cir. 2020) (internal quotation marks omitted). Yet whatever doubts might exist about the tax court's findings here, they rise nowhere near the level of certainty required for clear error.

For example, Slaughter's prior business-expense deductions amply support the tax court's finding. As the IRS noted throughout the proceedings below, those deductions were for (1) the rent for Slaughter's New York apartment that she used when going to trade shows and meeting with publishers, (2) payments for a car—which was the same model used by her main character Sara Linton—that she drove to interviews and promotional and networking events, (3) catering expenses and gifts for business associates, and (4) expenses for advertising, her website, and "promotions." Slaughter could not have claimed deductions for those expenses unless they were paid or incurred "in carrying on any trade or business." 26 U.S.C. § 162(a). That Slaughter deducted these expenses illustrates that the promotion of her written work was part of her writing business. Indeed, the promotion and sale of books is a key factor distinguishing a writing business, which one engages in for income and profit, from a writing hobby.

Second, Slaughter's insistence that her promotional activities were interrupted and not full time—and therefore too sporadic and occasional to be a part of her trade or business—is inconsistent with her own position. Although Slaughter maintains

10

that her trade or business is limited to the physical labor of writing—the act of putting pen to paper or finger to key—she spent only approximately 16 and 25 percent of 2010 and 2011, respectively, engaged in that labor. By Slaughter's own definition, her writing—an indisputably core part of her trade or business—would qualify only as "sporadic and occasional." Both common sense and Slaughter's own position therefore require that her promotional activities be considered part of her trade or business. *Helvering v. Horst*, 311 U.S. 112, 118 (1940) ("Common understanding and experience are the touchstones for the interpretation of the revenue laws.").

Accordingly, we conclude that the tax court did not err in determining that Slaughter's promotional activities were sufficiently continuous and regular to be a part of her trade or business.

*B. Slaughter's Publishing Income Derived From Her Trade or Business*

Slaughter also argues that the tax court erred in finding that all of her publishing income in 2010 and 2011 was derived from her trade or business. This argument differs from her first argument: the fact that Slaughter's promotional activities were a part of her trade or business does not automatically mean that all of her publishing income was derived from her trade or business. We have held that for self-employment income to be derived from a trade or business, "there must be a nexus between the income received and a trade or business that is, or was, actually

11

carried on." *Peterson*, 827 F.3d at 986 (cleaned up). Additionally, "the income must arise from some actual (whether present, past, or future) income-producing activity of the taxpayer before such income becomes subject to self-employment taxes." *Id.* (cleaned up). Nonetheless, "[t]he self-employment tax provisions are broadly construed to favor treatment of income as earnings from self-employment." *Id.* (quoting *Bot v. Comm'r*, 353 F.3d 595, 599 (8th Cir. 2003)).

Here, Slaughter argues that income from her intangible assets—specifically the rights to her name and likeness, access to her readership, the right to use characters from her previous books, and noncompetition agreements—is not subject to self-employment tax because there is no nexus between that income and her trade or business. In support of this argument, she cites a Ninth Circuit decision stating that the nexus test is satisfied only if the "earnings [are] tied to the quantity or quality of the taxpayer's prior labor, rather than the mere fact that the taxpayer worked or works for the payor." *Milligan v. Comm'r*, 38 F.3d 1094, 1098 (9th Cir. 1994).

Slaughter's position finds no purchase in the Ninth Circuit's test. We have declined to apply the Ninth Circuit's quantity-or-quality test beyond the context of post-termination payments to insurance agents. *See Peterson*, 827 F.3d at 992–93 (describing *Milligan* as "nonbinding," "distinguish[ing] [that] insurance case[] on at least four bases," and concluding that "the after-termination payments of insurance salesmen" in that case were not "comparable" outside its facts). And even if the

Ninth Circuit's test did apply here, we think that all of Slaughter's publishing income—including the portions from her intangible assets—readily satisfies it. If Slaughter ceased to write or promote her books, then her brand and success as an author would be affected. If she were not writing books, publishers would pay less—or even nothing—for her name and likeness, access to her readership, the right to use her characters, and her agreements not to compete.

Slaughter's objections to this conclusion focus primarily on her name and likeness and her noncompetition agreements. Regarding her name and likeness, she avers that their licensing "can[not] be reasonably described as used predominantly for profit rather than as a personal right." She then concludes that income from that licensing cannot be derived from her trade or business because trade or business activity must have the primary purpose of profit. Although she is correct that trade or business activity must be primarily profit-motivated, there is no reason to believe that Slaughter—a longtime bestselling author who has earned millions of dollars from her books—licensed her name and likeness for use on books and related materials for any purpose other than increasing her profit.

As for her noncompetition agreements, Slaughter avers that income from an agreement not to compete does not derive from a trade or business. But the supporting caselaw that Slaughter cites in fact undermines her assertion. As she correctly notes, the tax court has previously addressed "whether noncompetition

13

under a covenant not to compete constitutes a trade or business[.]" *Ohio Farm Fed'n, Inc. v. Comm'r*, 106 T.C. 222, 234 (1996). But contrary to her suggestion, the tax court did not categorically exclude such noncompetition from being a trade or business. Instead, it held that the standard continuity-and-regularity test applied and concluded that in the case before it, "a one-time agreement not to engage in certain activities" did not constitute "the kind of continuous and regular activity characteristic of a trade or business." *Id.* But Slaughter's noncompetition agreements were not one-time events—noncompetition clauses appeared in every American contract that she signed. Moreover, the clauses for the most part did not prevent Slaughter from writing for other publishers—they merely required her to complete the contracted books first. Consequently, we cannot say that the tax court erred in determining that Slaughter's income from her noncompetition agreements was derived from her trade or business.

Accordingly, we conclude that the tax court did not err in determining that all of Slaughter's publishing income in 2010 and 2011 was derived from her trade or business.

## IV. CONCLUSION

For the reasons stated above, we **AFFIRM** the tax court's decision.