T.C. Memo. 1997-395


UNITED STATES TAX COURT


JOHN W. MADDEN, JR., ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 6639-93, 6696-93,        Filed August 27, 1997.
            6697-93, 6698-93,
            6699-93.


<u>Sheldon H. Smith</u>, for petitioners.

<u>Virginia L. Hamilton</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

FAY, <u>Judge</u>:  Respondent determined deficiencies as follows:

---

[1]Cases of the following petitioners are consolidated here-
with for purposes of trial, briefing and opinion:  Museum of
Outdoor Arts, docket No. 6696-93; Cynthia Madden Leitner, docket
No. 6697-93; Plaza Developers Holdings, LLC, A Colorado LLC,
docket No. 6698-93; Marjorie P. Madden, docket No. 6699-93.

Docket No. 6639-93.  John W. Madden, Jr.:

| Year | Deficiency | First Tier Deficiency | Second Tier Deficiency |
|------|------------|-----------------------|------------------------|
|      | Secs. 511-513 | Secs. 4941(a)(1) and (2), 4945(a)(2) | Sec. 4941 (b)(1) and (2) |
| 1983 | -- | $40 | -- |
| 1984 | -- | 2,192 | -- |
| 1985 | -- | 3,404 | -- |
| 1986 | -- | 4,397 | -- |
| 1987 | -- | 4,840 | -- |
| 1988 | -- | 6,005 | -- |
| 1989 | -- | 6,531 | -- |
| 1990 | -- | 6,531 | -- |
| 1991 | -- | 6,531 | -- |
| 1992 | -- | 6,531 | $159,179 |

Docket No. 6696-93.  Museum of Outdoor Arts:

| Year | Deficiency | First Tier Deficiency | Second Tier Deficiency |
|------|------------|-----------------------|------------------------|
|      | Secs. 511-513 | Secs. 4941(a)(1) and (2), 4945(a)(2) | Sec. 4941 (b)(1) and (2) |
| 1984 | $8,088 | -- | -- |
| 1985 | 10,679 | -- | -- |
| 1986 | 7,596 | -- | -- |
| 1987 | 47,465 | -- | -- |
| 1988 | 43,565 | $300 | -- |

Docket No. 6697-93.  Cynthia Madden Leitner:

| Year | Deficiency | First Tier Deficiency | Second Tier Deficiency |
|------|------------|-----------------------|------------------------|
|      | Secs. 511-513 | Secs. 4941(a)(1) and (2), 4945(a)(2) | Sec. 4941 (b)(1) and (2) |
| 1983 | -- | $40 | -- |
| 1984 | -- | 792 | -- |
| 1985 | -- | 1,784 | -- |
| 1986 | -- | 2,844 | -- |
| 1987 | -- | 3,287 | -- |
| 1988 | -- | 4,452 | -- |
| 1989 | -- | 4,978 | -- |
| 1990 | -- | 4,978 | -- |
| 1991 | -- | 4,978 | -- |
| 1992 | -- | 4,978 | $97,055 |

Docket No. 6698-93.  Plaza Developers Holdings, LLC, A Colorado Limited Liability Company:

| Year | Deficiency | First Tier Deficiency | Second Tier Deficiency |
|------|------------|----------------------|------------------------|
|      | Secs. 511-513 | Secs. 4941(a)(1) and (2), 4945(a)(2) | Sec. 4941 (b)(1) and (2) |
| 1983 | -- | $80 | -- |
| 1984 | -- | 184 | -- |
| 1985 | -- | 372 | -- |
| 1986 | -- | 746 | -- |
| 1987 | -- | 1,631 | -- |
| 1988 | -- | 3,961 | -- |
| 1989 | -- | 5,014 | -- |
| 1990 | -- | 5,014 | -- |
| 1991 | -- | 5,014 | -- |
| 1992 | -- | 5,014 | $200,568 |

Docket No. 6699-93.  Marjorie P. Madden:

| Year | Deficiency | First Tier Deficiency | Second Tier Deficiency |
|------|------------|----------------------|------------------------|
|      | Secs. 511-513 | Secs. 4941(a)(1) and (2), 4945(a)(2) | Sec. 4941 (b)(1) and (2) |
| 1983 | -- | $40 | -- |
| 1984 | -- | 2,192 | -- |
| 1985 | -- | 3,404 | -- |
| 1986 | -- | 4,397 | -- |
| 1987 | -- | 4,840 | -- |
| 1988 | -- | 6,005 | -- |
| 1989 | -- | 6,531 | -- |
| 1990 | -- | 6,531 | -- |
| 1991 | -- | 6,531 | -- |
| 1992 | -- | 6,531 | $159,179 |

All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

The parties have made numerous concessions, including respondent's concession of the second tier deficiencies originally determined with respect to petitioner John W. Madden,

Jr. (petitioner), Marjorie P. Madden (petitioner's wife), and
Cynthia Madden Leitner (petitioner's daughter).  The issues
remaining for decision are:

(1)  Whether the Museum of Outdoor Arts (the Museum) is
liable, as lessor, for unrelated business income tax (UBIT) on
amounts received from 1984 through 1988 in connection with the
leasing of office building spaces;

(2)  whether the Museum is liable, as lessor, for UBIT on
amounts received in 1987 and 1988 in connection with the leasing
of Fiddler's Green Amphitheatre (FGA);

(3)  whether Greenwood Maintenance Co.[2] (GMC) is liable for
the excise tax under section 4941(a)(1) in connection with
payments received by it from the Museum from the years 1983
through 1989;

(4)  whether petitioner, petitioner's wife, and petitioner's
daughter are liable for the excise tax under section 4941(a)(2)
in connection with payments made by the Museum to GMC from the
years 1983 through 1989;

(5)  whether petitioner, petitioner's wife, and petitioner's
daughter are liable for the section 4941(a)(2) excise tax in

---

[2]As of Jan. 1, 1994, Plaza Developers Holdings, LLC, assumed
the assets, liabilities, and potential liabilities of Greenwood
Maintenance Co. (GMC), and GMC ceased to exist at that time.
Plaza Developers Holdings, LLC, is the named party in docket No.
6698-93.  However, for clarity, we will refer to Plaza Developers
Holdings, LLC, as GMC.

connection with three payments in the amounts of $2,304, $1,343, and $3,000 made by the Museum.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioner and petitioner's wife resided in Englewood, Colorado, at the time he filed his petition.[3]

Petitioners

Petitioner formed the John Madden Co. (the Company) in 1969. The Company, which develops and manages commercial office buildings and office parks, played an integral role in developing Greenwood Plaza, a Denver, Colorado, office complex consisting of 49 commercial office buildings spread over 200 acres of land. The Company, via a number of different partnerships, owned nine of the buildings in the complex during the years at issue.

The Museum, a private foundation incorporated in the State of Colorado, is located in the Greenwood Plaza complex. Petitioner is one of the founders of the Museum and was a foundation manager of the Museum under section 4946(b) during the years at issue. Petitioner's wife served as treasurer of the Museum

_____

[3]Cynthia Madden Leitner (petitioner's daughter) resided in Littleton, Col., at the time she filed her petition. The principal place of business of GMC and the Museum of Outdoor Arts (the Museum) was Englewood, Col., when they filed their petitions.

during 1985 and 1986, secretary/treasurer during 1987, and secretary during 1988 and 1989. Petitioner's daughter served on the board of directors of the Museum during all the years at issue. She was the secretary of the Museum from 1983 through 1985, president of the Museum during 1986, and president/vice president from 1987 through 1989. Both petitioner's wife and petitioner's daughter were foundation managers of the Museum under section 4946(b) during the years at issue.

The Museum, an "outdoor" museum which can be best described as a "museum without walls", was granted its tax-exempt status under section 501(c)(3) on September 3, 1982. The principal purposes of the Museum, as set out in its Articles of Amendment, include the "stimulation, promotion and development of the interest of the general public in every manner of art forms through organization and operation of outdoor and indoor museums, the holding and sponsorship of music concerts, art exhibitions and theatrical and dance performances, all for cultural and educational purposes". The Museum's artwork consists primarily of sculptures and other exhibits that are designed to withstand the outdoor elements. Although a few pieces are located in public atria inside some of the buildings, most of the artwork is situated along the public thoroughfares that run throughout the Greenwood Plaza complex. The Museum conducts tours of its artwork and also offers courses in art to members of the community.

The Museum relies on the Company to provide most of its management facilities. Specifically, the John Madden Co. furnishes office space to the Museum, rent free, in one of the buildings owned by the Company. Further, the Company allows the Museum to use its accounting system free of charge.

The Museum also relies on the building owners (including the Company) to provide spaces inside and outside their buildings free of charge to display its artwork. Periodically, members of the community hold special events, such as wedding receptions or bar mitzvahs, in the spaces provided by the building owners. In these instances, the Museum charges the community members a fee for the use of the spaces furnished by the building owners. These special events were held at various times during the years at issue. The Museum recorded the following amounts as leasing revenue, and incurred the following expenses, in connection with the leasing of the office building spaces:

| Year | Revenues | Expenses |
| --- | --- | --- |
| 1985 | $300 | $1,913 |
| 1986 | 9,560 | 7,810 |
| 1987 | 12,426 | 10,540 |
| 1988 | 8,638 | 5,244 |

Except for $425 in 1988, all of the expenses listed for the years 1986, 1987, and 1988 relate to payments made by the Museum to GMC for services furnished by GMC in connection with the special events. Prior to 1983, GMC did not charge the Museum any fee for its services.

In the early 1980's, the Company hired Dr. Sherry Manning as its new chief executive officer. Prior to being hired by the Company, Dr. Manning had been the president of Colorado Women's College. Dr. Manning told petitioner's daughter that GMC could charge the Museum for the services it provided to the Museum, so long as the charge was not higher than the fair market rate for the services rendered. As indicated above, GMC began charging the Museum for the services that it provided in connection with the special events.

Greenwood Maintenance Co.

Petitioner owns a 75-percent stake in GMC, a maintenance and janitorial company. Thus, GMC is defined as a disqualified person under section 4946(a)(1) with respect to the Museum.

During the years at issue, GMC performed maintenance functions for approximately 20 of the buildings in Greenwood Plaza, including all of the buildings owned by the Company. Throughout the years at issue, the Museum contracted with GMC to perform janitorial and related services. Depending on the job requirements, GMC would either perform the work itself or sub-contract with third parties to have the work performed.

Fiddler's Green Amphitheatre

On August 26, 1986, Greenwood Plaza South, a partnership in which petitioner was a partner, donated FGA to the Museum. Con-current with the FGA donation, a 3-acre park contiguous to the

amphitheater, known as Samson Park, was also donated to the Museum.

FGA is an outdoor amphitheater built in 1982 as an earth sculpture. From the time of its development until it was donated to the Museum in August 1986, the Museum used FGA approximately five times each year for performing arts events.

On July 17, 1986, 3 weeks prior to the donation, the Museum executed the FGA long-term facility lease agreement (the First Lease) with MCA Concerts, Inc. (MCA), for the lease of FGA. After entering into the First Lease, the Museum sent a copy of the First Lease to the New York law firm of Baer Marks & Upham for advice regarding any issues that might affect the Museum's tax-exempt status.

By a letter dated February 2, 1987, Baer Marks & Upham replied to the Museum's inquiry and made a number of suggestions for changes in the lease. Thereafter, on August 7, 1987, the Museum executed the first amended and restated FGA long-term facility lease agreement (the Second Lease). Pursuant to their agreement, after entering into the First Lease, MCA installed individual seats, constructed a sound wall, and made other improvements to FGA. After the renovations, FGA could accommodate an audience of 18,000 people, and many popular performers could, and did, put on shows at FGA.

The Second Lease provides that the Museum will collect rent from MCA based on a fixed percentage of gross receipts, but that,

in any event, the rent will not be less than $120,000 per year. The Second Lease also imposes certain obligations on the Museum. First, the Museum is required to use its best efforts with respect to obtaining any necessary permits. Second, the Museum is required to maintain the property and secure it from damage. Third, the Museum is obligated to arrange for 5,000 parking spaces. In order to arrange for the parking spaces, the Museum entered into parking license agreements with building owners in the Greenwood Plaza complex. Pursuant to these licenses, the building owners agreed to make their buildings' parking spaces available to concert patrons, and in return the Museum agreed to arrange for security and cleanup of the parking areas. Finally, the Second Lease contains a sublease clause. Under this clause, MCA must remit 25 percent of the sublease rentals to the Museum. The sublease rentals are defined as the gross receipts received by MCA from the sublessees less any out-of-pocket expenses incurred by MCA in connection with the subleases.

Self-Dealing Transactions

Petitioner is a disqualified person, as defined by section 4946(a)(1), with respect to the Museum. Petitioner admits that on June 5, 1985, the Museum and petitioner engaged in a self-dealing transaction. He also admits that, on July 12, 1985, he and the Museum engaged in a self-dealing transaction. Petitioner concedes that he owes the first tier excise tax under section 4941(a)(1) on the self-dealing transactions.

The transactions involve payments made by the Museum for repairs to artwork owned by petitioner. In each case, petitioner was out of town when the transactions occurred. As noted supra, employees of the Company performed accounting services for the Museum. While petitioner was out of town, checks were issued from the Museum's bank account for services rendered to repair petitioner's artwork. Petitioner's daughter learned of the transactions a day or two after they occurred and corrected them immediately by having petitioner reimburse the Museum.

A third transaction at issue involves a $3,000 payment made by the Museum to Form, Inc. Form, Inc., is an association of artists who create large stone sculptures. The payment relates to art exhibition expenditures made pursuant to a contract with Form, Inc. However, the Company is the named party in the contract with Form, Inc., not the Museum.

OPINION

Issue 1. Leasing of Building Spaces

The first issue for decision involves whether the income received from the Museum's leasing of building spaces to members of the community constitutes unrelated business taxable income (UBTI). Respondent determined in the notice of deficiency that the leasing[4] revenues received by the Museum constitute income

---

[4]For simplicity, we refer to the revenue from special events as "leasing" revenue. We use the term "leasing" as a label only and offer no opinion on whether this income constitutes rent from
(continued...)

from a trade or business, regularly carried on for profit and not substantially related to the exempt function of the Museum. Therefore, respondent contends the leasing income is UBTI under section 513. The Museum argues that making building spaces and artwork available to the public is substantially related to its exempt function. We agree with the Museum.

The income of organizations classified under section 501(c)(3) is generally exempt from taxation. However, section 511(a) imposes a tax on the "unrelated business taxable income" of section 501(c)(3) organizations. UBTI is defined in section 512(a) as income derived by an organization from any "unrelated trade or business" regularly carried on by it. Section 513(a) defines the term "unrelated trade or business" as the conduct of a trade or business that is not substantially related to the organization's exempt purpose.

The regulations and case law specify three elements necessary for income to be UBTI: (1) The activity being conducted must rise to the level of a trade or business, (2) the trade or business must be regularly carried on by the organization, and (3) the conduct of the trade or business must not be substantially related to the organization's tax-exempt purpose. Ohio Farm Bureau Fedn., Inc v. Commissioner, 106 T.C. 222 (1996); sec. 1.513-1(a), Income Tax Regs. These elements are conjunctive, and

---

⁴(...continued)
real property under sec. 512(b)(3)(A)(i).

each must be present for income to be UBTI.  Here, we shall focus our attention on the third element; namely, whether the leasing of museum spaces was substantially related to the Museum's exempt purpose.

An activity is substantially related to an organization's exempt purposes where the performance of the activity has a substantial causal relationship to the achievement of the exempt purposes.  Sec. 1.513-1(d)(2), Income Tax Regs.  The activity must contribute importantly to the accomplishment of those pur- poses.  Id.  This determination is based upon all of the facts and circumstances surrounding the activity.  Id.

In evaluating the substantial relationship, we focus our inquiry on the manner in which the Museum conducts its activi- ties.  United States v. American College of Physicians, 475 U.S. 834, 848-849 (1986).  Specifically, we will determine whether the manner in which the Museum leased the building spaces to the public manifests an intent to further its exempt purposes or whether that manner indicates an intent to merely raise revenue. National League of Postmasters of the United States  v. Commis- sioner, T.C. Memo. 1995-205, affd. 86 F.3d 59 (4th Cir. 1996). We begin by noting that the amount of revenue involved for each year is not significant.  More importantly, the revenues earned by the Museum from this activity barely exceeded the related expenses, and in some years the Museum actually suffered losses. This fact lends credence to the Museum's argument that the

leasing activity was performed mainly to expose the artwork to people who otherwise would not have seen it, rather than as a revenue-generating activity.

At this point, we recall the stated purposes of the Museum. The Museum was created to expose people to the outdoor arts and to promote interest in outdoor objects as art forms. By offering the building spaces for special events, the Museum argues that it effectively exhibited the artwork to an audience who normally would not have come to the Greenwood Plaza and viewed the exhibits. This rationale is consistent with the Museum's stated purposes. Accordingly, we conclude that the Museum's leasing of building spaces to members of the public was substantially related to its exempt purpose. Therefore, the revenue generated by this activity is not UBTI.

Issue 2. Leasing of FGA

The second issue for decision concerns whether the Museum realized UBTI from leasing FGA to MCA. In the notice of deficiency, respondent determined that revenues from the lease with MCA constitute income from a trade or business, regularly carried on for profit and not substantially related to the exempt function of the Museum, thereby resulting in UBTI under section 513. The Museum disputes this determination.

The Museum contends that the leasing activity did not rise to the level of a trade or business, and, even if it did, it was not regularly carried on. In making this determination, the size

of the property and the taxpayer's activities with respect to the property are important factors. See generally Curphey v. Commissioner, 73 T.C. 766 (1980). FGA is substantial, with a capacity to seat 18,000 patrons. The lease was not a short-term arrangement, as it provided for a 6-year initial term. Further, the Museum was required under the Second Lease to make arrangements for security and parking. Prior cases make clear that leasing activities of this nature constitute a trade or business that are regularly carried on. See Ohio County & Indep. Agric. Societies, Delaware County Fair v. Commissioner, T.C. Memo. 1982-210.

Next, the Museum contends that the leasing activity is substantially related to its exempt purpose, because the Museum was established to promote live shows and performing arts events. The Museum asserts that it could have put on these productions itself. Therefore, the Museum argues that it did not generate UBTI by merely leasing FGA and having MCA arrange for the performances.

As discussed supra, an activity is substantially related to an organization's exempt purpose where the activity has a substantial causal relationship with the achievement of the exempt purpose. Sec. 1.513-1(d)(2), Income Tax Regs. In evaluating the substantial relationship, we examine the manner in which the Museum conducted its activities in order to determine whether there was an intent to further its exempt purposes or simply make a profit. United States v. American College of Physicians, supra

at 848-849.  Individual seats were installed in FGA in prepara-
tion for the concert productions that MCA intended to put on.
The Museum has offered no aesthetic reasons for installing
individual seats in FGA (a completely earthen structure which
itself can be described as a work of art), and the record
contains no evidence that the facility was upgraded for any
reasons other than commercial ones.  Further, we note that the
productions put on by MCA involved popular performers and
commanded premium ticket prices.  Finally, the amount of money
involved with the Second Lease was substantial.  On the basis of
these facts, we conclude the Museum leased FGA primarily to make
a profit and not to substantially further its exempt purposes.

The Museum argues that, even if the lease proceeds represent
unrelated business income, they fall within the passive real-
estate exception to UBTI.  Section 512(b)(3) specifically
excludes real property rents from UBTI.  However, in order to
satisfy the passive rent exception, the leasing arrangement must
meet certain guidelines.  First, the landlord may not render
substantial services under the lease for the convenience of the
tenant.  Sec. 1.512(b)-1(c)(5), Income Tax Regs.  Second, the
statute prescribes that the determination of rent must not
depend, in whole or in part, on the income or profits derived by
any person from the leased property (other than an amount based
on a fixed percentage of receipts or sales).  Sec.
512(b)(3)(B)(ii).  Respondent attacks the arrangement with MCA on

both fronts and concludes that the Second Lease does not qualify for the passive rental exception under section 512(b)(3).

Respondent contends the Museum rendered substantial services solely for the convenience of MCA. Specifically, respondent directs our attention to three lease provisions: The requirement that the Museum arrange for parking; the requirement that the Museum maintain the FGA grounds and arrange for security; and the requirement that the Museum use its best efforts with respect to obtaining the necessary permits and licenses (e.g., a liquor license). We will deal with each of these in turn.

Respondent argues that the parking arrangements under the lease constitute substantial services not typically rendered to tenants. The Museum responds that, just as the Museum is without walls, FGA is an amphitheater without parking spaces. Therefore, the Museum had no choice but to arrange for parking spaces, because otherwise it would be impractical to hold concerts at FGA.

We agree with the Museum that arranging for the parking spaces was not an impermissible service provided to MCA. The regulations proscribe services rendered to the tenant if they are "primarily for his convenience and are other than those usually or customarily rendered in connection with the rental of rooms or other space for occupancy only." Sec. 1.512(b)-1(c)(5), Income Tax Regs. For instance, the regulations state that maid services, such as found at a hotel, are impermissible personal

services, whereas the cleaning of public areas and the collection of trash are not considered to be services rendered primarily for the convenience of the tenant. Id.

Typically, a complex such as FGA is built with parking areas surrounding the structure. Any lease of the building necessarily contemplates that the lessee will be able to use the surrounding parking spaces. Here, the Museum was required to undertake unique measures in order to provide the parking necessary for MCA to use FGA. These arrangements were necessary to put FGA on equal footing with similar complexes and do not represent impermissible services under the regulation. The evidence at trial indicates that, once the spaces were made available, MCA took on the primary responsibility of managing the parking spaces during the concerts, although the Museum retained some responsibility for security and cleanup. In effect, instead of building a parking garage, the Museum created parking spaces through these license arrangements. Once the arrangements were complete, however, the Museum turned over the primary operating duties to MCA for the duration of the concerts. These arrangements do not constitute impermissible services.

Respondent also argues that the maintenance and security services furnished by the Museum are impermissible services provided to the tenant. The Second Lease requires the Museum to maintain or provide for the maintenance of all existing structures at the outset of the Second Lease and to arrange for

security on days that MCA is not using FGA.  MCA agreed to pay the Museum $15,000 a year to help defray the Museum's expenses incurred in arranging for these services.  Respondent argues that the maintenance of FGA was a service rendered for the benefit of the lessee.

We cannot agree with respondent's contention that the maintenance services went beyond what a landlord would normally furnish in a lease for occupancy.  In fulfilling this obligation, the Museum simply contracted with a landscaping company to maintain the grounds surrounding the amphitheater.  Further, the evidence indicates that, after MCA took possession of the structure in 1988, the Museum did not provide, nor contract with a third party to provide, security services for FGA.  Maintaining the grounds surrounding a building is a service customarily rendered by lessors and is not an impermissible service for purposes of the regulation.

Finally, respondent argues that the "best efforts" clause in the Second Lease is an impermissible service for the benefit of the lessee.  The clause states that the Museum will use its "best efforts" to assist MCA in obtaining any permits or licenses, such as those necessary for the sale of beer, wine, and spirits at FGA.  Upon the advice of Baer Marks & Upham, a clause was added to the Second Lease which specified that the Museum was required to lend only such assistance as is usually and customarily rendered by landlords to tenants.  No evidence was adduced at

trial concerning what actions, if any, the Museum actually took with regard to the "best efforts" clause.

The Museum argues that it is not obligated under this clause to render a service primarily for the benefit of the lessee. Rather, the Museum asserts that this clause was inserted to ensure that the Museum would sign any application which required the landlord's signature. While the term "best efforts" connotes more than merely signing an application for a license, the evidence at trial supports petitioner's assertion. No evidence was presented at trial to contradict the Museum's assertions in this regard. Consequently, we find that no impermissible services were performed pursuant to the best efforts clause. On the basis of the foregoing discussion, we conclude that the Museum did not render substantial services for the benefit of MCA that go beyond those services usually rendered in connection with the rental of real estate.

Next, we shall address respondent's argument that the rental income was based, in part, on MCA's net income or profits. Section 512(b)(3)(B)(ii) specifically denies the rental income exclusion where the amount of rent is based, in whole or in part, on the income or profits derived by any person from the leased property, other than an amount based on a fixed percentage or percentages of receipts or sales. Oblinger Trust v. Commissioner, 100 T.C. 114 (1993).

Respondent contends that the sublease provision of the Second Lease requires MCA to remit to the Museum 25 percent of its profits derived from any sublease of FGA, and thus the rent is being calculated, in part, based on a percentage of MCA's profits from FGA. Moreover, respondent asserts that, in 1988, amounts were remitted to the Museum as a result of a Budweiser-sponsored event, and those amounts were in fact calculated under the sublease provisions of the Second Lease.

At the outset, we note that certain rules related to real estate investment trusts are made applicable to the determination of what amounts constitute rent from real property. Sec. 1.512(b)-1(c)(2)(iii)(b), Income Tax Regs. Pursuant to section 1.856-4(b)(3), Income Tax Regs., where the rent received under a lease consists of both a fixed amount and an amount based on the income or profits of the lessee, then none of the amounts received qualify as "rents from real property". However, where the amount received under such a lease includes only the fixed portion of the rent, then that amount qualifies as "rents from real property". Id. The evidence indicates that the only inclusion under the sublease clause occurred in 1988. Consequently, only the rent paid in 1988 may be subject to UBIT under this theory.

As outlined supra, respondent's argument focuses on the sublease provision of the Second Lease, which requires MCA to remit 25 percent of the profits derived from a sublease of FGA.

Specifically, the lease contains the following sublease
provision:

> MCA shall pay the Museum a lease fee equal to twenty-
> five percent (25%) of all Sublease Rentals.  As used in
> this Agreement, "Sublease Rentals" means all receipts
> realized by MCA from the subletting of the Amphi-
> theatre, less all out-of-pocket expenses (including,
> but not limited to, supplies, utilities and personnel
> costs) incurred by MCA as a direct result of the sub-
> letting * * *.

Further, respondent notes that, in 1988, a Budweiser-sponsored
event was held, and a portion of the profits, as calculated under
this provision, was remitted to the Museum.  The Museum does not
dispute that the fees from the Budweiser-sponsored event were
paid to the Museum but contends that the total fees involved
amounted to only $836, an insubstantial amount in comparison to
the whole lease, and, therefore, this small amount should not
"taint" the whole lease.[5]

The statutory language upon which respondent relies is very
clear.  Section 512(b)(3)(B)(ii) provides that the exclusion of
rents from UBTI shall not apply "if the determination of the
amount of such rent depends in whole or in part on the income or
profits derived by any person from the property leased" (emphasis
added).  The Museum does not argue that the amount remitted under

---

[5]In support of this assertion, the Museum cites Kentucky Bar
Found., Inc. v. Commissioner, 78 T.C. 921 (1982); Policemen's
Benevolent Association of Westchester County, Inc. v. Commis-
sioner, T.C. Memo. 1981-679.  The cases do not touch upon sec.
512 and are therefore inapposite.

the sublease clause did not constitute a percentage of the profit derived from the Budweiser-sponsored event.  Obviously, it did.

The Museum principally argues that we should recognize a de minimis exception to the above-quoted language.  We refuse to do so.  The statute explicitly contemplates that, as is the case here, proscribed rental payments may constitute only a portion of the total rents received.  It is axiomatic that an unambiguous statute should be given effect according to its plain and obvious meaning.  See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-843 (1984); Bate Refrigerating Co. v. Sulzberger, 157 U.S. 1, 36-37 (1895); Halpern v. Commissioner, 96 T.C. 895 (1991).  Here, a portion of the rent paid in 1988 was determined based upon the profits that MCA derived from the Budweiser-sponsored event.  Accordingly, none of the rent paid by MCA in 1988 qualifies under section 512(b)(3)(A)(i) as rent from real property, and it is therefore subject to UBIT.[6]

_____

[6]While the result may seem inequitable, the Museum had been put on notice that the sublease provision of the Second Lease potentially subjected the total lease proceeds to UBIT.  The opinion letter from Baer Marks & Upham points out that the sublease revenue provision could possibly taint all the proceeds from the lease.  The letter recommends that the Museum recast the provision from the First Lease.  In response, the Museum changed the term "Net Sublease Revenues" to "Sublease Revenues".  Aside from deleting the word "Net", no changes were made to the substantive portions of the sublease revenue provision in the Second Lease.

The Museum contends that the arrangement with Budweiser did not amount to a sublease, and therefore the proceeds from the event do not taint the remaining rental income under the Second Lease. The Museum misconstrues respondent's argument. The Museum's contention is premised on the belief that respondent is assailing the arrangement with MCA based upon section 1.856-4(b)(6), Income Tax Regs. That regulation covers situations involving a lease based, at least in part, on the gross receipts of the lessee, where the lessee has subleased the property to a sublessee. There, the rent being calculated under the sublease is based upon the profits of the sublessee. Respondent's position, however, is premised on the fact that the lease proceeds the Museum collects are based on the profits of MCA, and respondent's argument has nothing to do with the labels attached to MCA's arrangement with Budweiser. Thus, the Museum's attempt to distinguish its situation from section 1.856-4(b)(6), Income Tax Regs., fails to address respondent's contentions. We therefore sustain respondent's determination that the rent received in 1988 from the lease with MCA is subject to UBIT.

Issue 3. Payments to GMC

Section 4941 imposes an excise tax for acts of "self-dealing" that occur between a private foundation and a "disqualified person". Sec. 4941(a)(1). The parties agree that GMC is a "disqualified person" with respect to the Museum, a private foundation. For the purposes of this section, "self-dealing"

includes the "furnishing of goods, services, or facilities between a private foundation and a disqualified person". Sec. 4941(d)(1)(C). However, section 4941(d)(2) provides several exceptions for certain arrangements that would otherwise constitute self-dealing transactions. Specifically, section 4941(d)(2)(E) provides:

> the payment of compensation (and the payment or reimbursement of expenses) by a private foundation to a disqualified person for personal services which are reasonable and necessary to carrying out the exempt purpose of the private foundation shall not be an act of self-dealing if the compensation (or payment or reimbursement) is not excessive * * *

Throughout the years at issue, the Museum contracted with GMC to perform general maintenance, janitorial, and custodial functions. Respondent maintains that payments to GMC for services performed are self-dealing transactions within the ambit of section 4941(d)(1)(C). Petitioner replies that these transactions fit within the exception in section 4941(d)(2)(E) as "personal services" which are reasonable and necessary to carry out the Museum's exempt functions. As might be expected, respondent disagrees.

The resolution of this issue depends solely on whether or not the functions that GMC performed fall within the definition of "personal services" of section 4941(d)(2)(E). Before making this determination, a review of the legislative history of section 4941 is helpful.

Prior to 1969, sections 501(a) and 503(a), (b), and (d) had imposed severe sanctions for transactions that resulted in the diversion of funds to a creator or substantial contributor of a tax-exempt organization. Further, in order to prevent tax-exempt foundations from being used to benefit their creators or substantial contributors, Congress had established a set of arm's-length standards for dealings between the foundations and these disqualified individuals. H. Rept. 91-413 (Part 1), at 21 (1969), 1969-3 C.B. 200, 214.

Nevertheless, Congress noted that abuses involving tax-exempt organizations continued. Congress believed the abuses resulted from the significant enforcement problems posed by the arm's-length standards. Id. Therefore, section 4941 was enacted as part of subchapter A of a new chapter 42 added to the Internal Revenue Code by the Tax Reform Act of 1969 (the 1969 Act), Pub. L. 91-172, sec. 101(b), 83 Stat. 487, 499.

One of the stated goals of the 1969 Act was to minimize the need for an arm's-length standard by generally prohibiting self-dealing transactions. Specifically, the 1969 Act prohibited the following transactions between a foundation and a disqualified person: (1) The sale, exchange or lease of property; (2) the lending of money; (3) the furnishing of goods, services or facilities; (4) the payment of compensation to a disqualified person; (5) the transfer or use of foundation property by a disqualified person; and (6) payments to Government officials.

S. Rept. 91-552, at 29 (1969), 1969-3 C.B. 423, 443.  If the foundation and a disqualified person entered into a prohibited transaction, then the 1969 Act imposed various levels of sanctions.

The question before us is whether the functions performed by GMC qualify as "personal services" under section 4941(d)(2)(E). Thus, we must construe what activities Congress intended would qualify as personal services.  At the outset, we can look to the regulations interpreting the statute.  While those regulations do not define the term "personal services", they offer several examples of activities that constitute "personal services".  See sec. 53.4941(d)-3(c)(2), Foundation Excise Tax Regs.  The activities set out in the examples include legal services, investment management services, and general banking services.  Id.

Respondent argues that the character of the services performed by GMC, namely maintenance, janitorial, and security, are different than those outlined in the regulations.  We agree. The services in the regulations are essentially professional and managerial in nature.  These types of services contrast with the nature of the services rendered by GMC.

GMC contends any activity is a service where capital is not a major factor in the production of income.  Under this interpretation, as set out in the brief, "the sale of goods is not the rendering of personal services, but certainly all other services which assist the private foundation in carrying on its legitimate

business are personal services."  We cannot agree with GMC's interpretation of the statute.  First, this position would nullify the prohibition against furnishing services contained in section 4941(d)(1)(C), because almost any service would be a "personal service" and fall within the exception.  The statute draws an explicit distinction between a "charge" for "furnishing of goods, services, or facilities", see sec. 4941(d)(1)(C) and (2)(C), and the payment of "compensation" "for personal services", see sec. 4941(d)(1)(D) and (2)(E).  GMC's argument equating a charge for services with compensation for personal services significantly erodes this distinction.

Second, GMC's interpretation of the term "personal services" contravenes congressional intent, as expressed in the above legislative history.  We think it is clear that Congress intended to prohibit self-dealing.  Consequently, any exceptions to the self-dealing transactions rules should be construed narrowly.  We therefore reject GMC's broad interpretation of the term "personal services" and conclude that the janitorial services provided by GMC do not meet the definition of "personal services".  Accordingly, we find that the payments made by the Museum to GMC constitute "self-dealing" within the meaning of section 4941(d)(1)(C), and, as a consequence, GMC is liable for the self-dealing excise tax under section 4941(a)(1).[7]

_____

[7]Respondent asserts that, if GMC is liable for the self-
(continued...)

Issue 4.  Excise Tax on Payments Made by the Museum to GMC

We shall next turn our attention to whether petitioner, petitioner's wife, and petitioner's daughter (the foundation managers)[8] are liable under section 4941(a)(2) for payments made to GMC by the Museum.  In general, section 4941(a)(1) imposes an excise tax on the self-dealer for each self-dealing transaction.  When an excise tax is imposed under section 4941(a)(1), then section 4941(a)(2) may impose excise taxes on the management of the foundation as well.  Section 4941(a)(2) provides:

> In any case in which a tax is imposed by [section 4941(a)] paragraph (1), there is hereby imposed on the participation of any foundation manager in an act of self-dealing between a disqualified person and a private foundation, knowing that it is such an act, a tax equal to 2½ percent of the amount involved with respect to the act of self-dealing for each year (or part thereof) in the taxable period, unless such participation is not willful and is due to reasonable cause. * * *

Thus, this tax is imposed only when (1) a tax is imposed under section 4941(a)(1), (2) the participating foundation manager

---

[7](...continued) dealer excise tax, then it is also liable for the foundation self-dealing excise tax under sec. 4941(b)(1).  GMC does not dispute this assertion.  The parties have stipulated that the transactions at issue were not corrected within the taxable period.

[8]A separate excise tax was imposed on petitioner, on petitioner's wife, and on petitioner's daughter (the foundation managers).  However, the legal issues and relevant facts are identical with respect to each of the foundation managers.  For brevity, we will combine our examination of each tax into a single discussion and refer to the above-named parties collectively as the foundation managers where possible.

knows that the act is an act of self-dealing, and (3) the participation by the foundation manager is willful and is not due to reasonable cause. Sec. 53.4941(a)-1(b)(1), Foundation Excise Tax Regs. Respondent must prove, by clear and convincing evidence, that the foundation managers participated knowingly in the self-dealing transaction. Sec. 7454(b); Rule 142(c).

We first turn to the regulations to provide the initial guidance in applying section 4941(a)(2). The regulations interpret what the statute requires for knowing participation. Section 53.4941(a)-1(b)(3), Foundation Excise Tax Regs., states:

> a person shall be considered to have participated in a transaction "knowing" that it is an act of self-dealing only if--
>
> (i) He has actual knowledge of sufficient facts so that, based solely upon such facts, such transaction would be an act of self-dealing,
>
> (ii) He is aware that such an act under these circumstances may violate the provisions of federal tax law governing self-dealing, and
>
> (iii) He negligently fails to make reasonable attempts to ascertain whether the transaction is an act of self-dealing, or he is in fact aware that it is such an act.

The regulations specify that the term "knowing" does not mean "having reason to know", but evidence that shows a person has a reason to know a fact is relevant in determining whether that person has actual knowledge of that fact. Id. These regulations were adopted in 1972, 3 years after the passage of the statute, and have not been substantially modified since that time. There-

fore, we must give appropriate weight to the regulations in interpreting the statute. Commissioner v. South Texas Lumber Co., 333 U.S. 496 (1948).

We have found no other cases that have analyzed the foundation manager excise tax under section 4941(a)(2). However, the Tax Court analyzed the foundation manager excise tax under section 4945(a)(2) in Thorne v. Commissioner, 99 T.C. 67 (1992). These statutes were both enacted as part of the chapter 42 reforms of the 1969 Act, and the statutes, as well as the respective regulations promulgated thereunder, contain nearly identical language. Thus, the analysis contained in Thorne v. Commissioner, supra, is highly probative in interpreting the excise tax of section 4941(a)(2). We concluded in Thorne v. Commissioner, supra at 105, that the threshold determination under the knowledge requirement is ascertaining the extent of the taxpayer's factual knowledge concerning the expenditures and not whether the taxpayer actually knew the expenditures were prohibited under the statute.

The parties have stipulated that the foundation managers were aware both that GMC was a disqualified person vis-a-vis the Museum, and that some transactions between a private foundation and a disqualified person are considered "self-dealing" under section 4941(d). Further, the parties have agreed that the foundation managers were aware self-dealing is defined as, inter alia, a direct furnishing of goods, services, or facilities

between a private foundation and a disqualified person. In addition, the parties have agreed that the foundation managers were aware the Museum was making payments to GMC, and the managers did not oppose the making of these payments. On the basis of these facts, we conclude respondent has proven, by clear and convincing evidence, that the foundation managers possessed actual knowledge of sufficient facts concerning the transactions to establish the arrangements with GMC were self-dealing transactions.

Respondent has satisfied both the first and second requirements of section 4941(a)(2). First, we have concluded that, under section 4941(a)(1), an excise tax should be imposed on the payments from the Museum to GMC. Second, respondent has established that the foundation managers possessed sufficient "knowledge" concerning the self-dealing payments to GMC. Next, we shall evaluate whether the foundation managers made the payments willfully and without reasonable cause, the third requirement under section 4941(a)(2).

The regulations define "willful" participation by the foundation manager as conduct that is "voluntary, conscious, and intentional." Sec. 53.4941(a)-1(b)(4), Foundation Excise Tax Regs. On the basis of the facts, we conclude the foundation managers voluntarily and intentionally caused the Museum to enter into the transactions with GMC. Accordingly, we sustain

respondent's determination that the participation of the foundation managers was willful.

Additionally, the foundation managers' participation in these transactions must not be due to reasonable cause. The regulations explain that "A foundation manager's participation is due to reasonable cause if he has exercised his responsibility on behalf of the foundation with ordinary business care and prudence." Sec. 53.4941(a)-1(b)(5), Foundation Excise Tax Regs. The foundation managers were aware that GMC was a disqualified person with respect to the Museum, and they were aware that tax laws prohibited self-dealing transactions. Nevertheless, they proceeded to contract with GMC to provide services to the Museum without first attempting to get advice from their counsel concerning the implications of these arrangements. This demonstrates a failure to exercise their responsibilities with ordinary business care and prudence.

The foundation managers argue that they acted on the advice of Dr. Sherry Manning. Dr. Manning, a former president of a women's college, has experience with nonprofit organizations. Thus, the foundation managers claim that they exercised ordinary prudence in relying on Dr. Manning's advice. We cannot agree. Dr. Manning is not a lawyer, and she does not otherwise have any special expertise in foundation tax law. Further, although she had been the president of a college, there is no indication in the record that Dr. Manning gained any experience in running

foundations.  Clearly, the foundation managers were aware of the potential problems with paying fees to GMC, as prior to the hiring of Dr. Manning, GMC had simply rendered the services for free.  We conclude the foundation managers did not exercise ordinary prudence by relying on the advice of Dr. Manning and not seeking the advice of counsel regarding these payments.  Accordingly, we hold that the foundation managers are liable for the foundation manager excise tax under section 4941(a)(2) for payments made by the Museum to GMC.

Issue 5.  Excise Tax on Other Payments Made by the Museum

Respondent determined that the foundation managers are liable for the foundation manager excise tax under section 4941(a)(2) for two payments made by the Museum that benefited petitioner and a third payment by the Museum that benefited the Company.  Specifically, the two payments which benefited petitioner, in the amounts of $2,304 and $1,343, were made by the Museum for work done to petitioner's artwork.  A third payment, in the amount of $3,000, related to a financial obligation of the Company which was actually paid by the Museum.  As discussed supra, a foundation manager excise tax under section 4941(a)(2) may be imposed where (1) a tax should be imposed under section 4941(a)(1), (2) the participating foundation manager knows that the act is an act of self-dealing, and (3) the participation by the foundation manager is willful and is not due to reasonable cause.  Sec. 53.4941(a)-1(b)(1), Foundation Excise Tax Regs.

Respondent must carry the burden of proving by clear and convincing evidence that the foundation managers participated knowingly in the transaction. Sec. 7454(b); Rule 142(c).

The foundation managers have conceded that each of these payments constitutes self-dealing under section 4941(a)(1). However, respondent must still prove that the foundation managers knew the act was an act of self-dealing. Also, the participation by the foundation managers must be willful and not due to reasonable cause.

As noted supra, the Company provided accounting services to the Museum. Two invoices relating to artwork repairs were received by the accounting department of the Company. The accounting personnel, assuming that the work had been performed on artwork owned by the Museum, made payments of $2,304 and $1,343 by checks drawn upon the Museum's bank account. In fact, the artwork belonged to petitioner, and the payments should have been made from petitioner's personal account.

Far from having actual knowledge of sufficient facts about the two transactions, the evidence indicates that the foundation managers lacked any knowledge concerning these transactions. Immediately upon learning of the payments a few days after they were made, petitioner's daughter corrected both of the transactions, and petitioner reimbursed the Museum for the expense. Under these circumstances, we conclude respondent erred in

imposing the foundation manager excise tax on these two transactions.

The record is less than complete regarding the $3,000 payment made for the benefit of the Company.[9] The payment was made by the Museum on behalf of the Company, a disqualified person. The Company has not reimbursed the Museum. Respondent, again, must prove by clear and convincing evidence that the foundation managers participated knowingly in this transaction. Sec. 7454(b); Rule 142(c). Respondent has failed to carry this burden. First, respondent has not shown that petitioner or petitioner's wife had any knowledge of this transaction. We refuse to presume that, because the transaction occurred, petitioner or petitioner's wife must have known about it. Consequently, we do not sustain respondent's determination with respect to petitioner or petitioner's wife as it relates to this transaction.

---

[9]On brief, the foundation managers contend that respondent has conceded this issue and directs our attention to the stipulation of facts filed in this case. Particularly, the foundation managers point to the stipulation concerning this payment, which reads: "the parties agree that John W. Madden, Jr. is not liable for the following [$3,000] payment made by the Museum for the benefit of the John Madden Company as a self-dealer under I.R.C. §§ 4941(a)(1) and (b)(1)". The stipulation makes no mention of potential liability under sec. 4941(a)(2). We will not read into the stipulation matters that are not expressly covered by it. See Rakosi v. Commissioner, T.C. Memo. 1991-630. Consequently, the foundation managers' potential liability under sec. 4941(a)(2) is still at issue in this case.

As for petitioner's daughter, the facts must be examined more closely. The $3,000 payment related to a contract with Form, Inc., for the creation of an outdoor art exhibit. The subject matter of the contract comports directly with the Museum's exempt purpose, and the contract was signed by petitioner's daughter as a director of the Museum. However, the John Madden Co. is the named party in the contract, not the Museum. The payment by the Museum for setting up the outdoor exhibit satisfied a financial obligation of the Company under the contract with Form, Inc., and the parties agree that it is a self-dealing payment to the Company.

Petitioner's daughter testified that she was aware of the payment made by the Museum. As evidenced by this testimony, she was knowledgeable about the subject matter of the contract. However, based on the testimony and surrounding facts, we conclude that her actions do not constitute knowing participation in a self-dealing transaction. Petitioner's daughter testified that the foundation managers intended to have the Museum shoulder the responsibility for the exhibit, not the Company.[10] She believed, at the time of the payment, that responsibility for the financial obligation rested with the Museum. As a consequence, petitioner's daughter did not view this payment as benefiting the

[10]This testimony is supported by the contract itself, as it was signed by petitioner's daughter in her position as the director of the Museum.

Company.  Given these circumstances, we conclude respondent has failed to prove by clear and convincing evidence that petitioner's daughter knowingly entered into a self-dealing transaction.  Accordingly, we do not sustain respondent's determination with respect to petitioner's daughter as it relates to this $3,000 transaction.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.